# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 01-1688

JAMES R. SNYDER,

*Plaintiff-Appellant,*

v.

JACK T. NOLEN,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98 C 671—**William L. Beatty**, *Judge.*

———————

ARGUED SEPTEMBER 20, 2002—DECIDED AUGUST 13, 2004

———————

Before EASTERBROOK, RIPPLE and KANNE, *Circuit Judges.*

PER CURIAM.  James Snyder filed this action pursuant to 42 U.S.C. § 1983 against Jack Nolen, Clerk of the Circuit Court of Saline County, Illinois. The complaint alleged that Mr. Nolen had violated Mr. Snyder's constitutional right of access to the courts when Mr. Nolen prevented Mr. Snyder from prosecuting a domestic relations action for dissolution of marriage and a temporary restraining order in the state court. The district court dismissed Mr. Snyder's complaint on the alternate grounds that it did not state a constitutional claim, that Mr. Nolen was entitled to absolute qua-si-judicial immunity and that Mr. Nolen was entitled to

qualified immunity. Mr. Snyder appealed, and this court now affirms.

It is the unanimous opinion of the court that Mr. Nolen is not protected by absolute quasi-judicial immunity. Nevertheless, it is the opinion of the majority of the panel that Mr. Snyder has not stated a claim for a constitutional violation of right to access to the courts; the individual judges, however, differ with respect to how they arrive at that determination. A third member of the panel is of the opinion that Mr. Snyder's complaint states a constitutional violation and that Mr. Nolen is not entitled to qualified immunity on that claim.

This per curiam opinion sets forth the procedural background of the case and articulates the court's holding with respect to the issue of absolute quasi-judicial immunity. The separate opinions of the panel majority follow, as does that of the panel's dissenting member.

# I

## BACKGROUND

### A.

In November of 1996, Mr. Snyder attempted to file a petition for a dissolution of marriage and a temporary restraining order against his wife, Denise Snyder, in the Circuit Court of Saline County, Illinois. In his petition, Mr. Snyder requested that the state court "enter an order restraining [his wife] from selling or concealing or encumbering in any manner" the property claimed to be his pursuant to a prenuptial agreement. R.22, Ex.1. Mr. Snyder alleged that he was estranged from his wife, that his wife was in sole possession of his non-marital property, that he was incarcerated in the custody of the Illinois Department of Corrections, and that his assets were at substantial risk because his wife had indicated to Mr. Snyder's friends that

she intended to liquidate certain property belonging to Mr. Snyder.

According to Mr. Snyder's complaint in this action, the pleadings that he proposed to file in the state domestic relations proceedings complied with that court's technical filing requirements and alleged a factual basis for a dissolution of marriage and for a temporary restraining order. Nevertheless, Mr. Nolen, as the Circuit Court Clerk, allegedly removed Mr. Snyder's pleadings from the court's docket and placed a large "X" over the court's "Filed" stamp with the word "error." R.22.[1] Mr. Nolen then returned the

---

[1] The district court characterized Mr. Nolen's conduct as a refusal to file Mr. Snyder's pleadings. We note, however, that Mr. Snyder's second amended complaint actually characterizes Mr. Nolen's conduct in two ways. First, the complaint alleges that Mr. Nolen wrongfully refused to file the pleadings. Second, the complaint states that "Nolen gave the court jurisdiction by affixing a file-stamp and docketing number, and his actions in 'whiting out' [the] same was an 'impermissible encroachment of judicial authority.'" R.22.

In *Coles v. Terrell*, 44 N.E. 391 (Ill. 1896), and more recently in *Ayala v. Goad*, 531 N.E.2d 1040 (Ill. App. Ct. 1988), the Illinois courts have held that, once the clerk has file stamped the pleading and docketed the case, the papers become the files of the court and cannot be withdrawn without leave of court. *See Coles*, 44 N.E. at 392 ("The clerk put his file mark upon it, and also docketed it in the probate docket. It then . . . most certainly became a part of the records of the court. It had passed completely out of the control of the party filing it, and it could not be subsequently withdrawn without an order of court. The clerk had no authority to permit its withdrawal."); *Ayala*, 531 N.E.2d at 1043 ("It is clear that by file stamping the complaint and assigning a docket number, the clerk's office filed the complaint on January 5, 1987, notwithstanding that the fee may not have been paid, and it was then in the exclusive custody and control of the clerk's office and a part of (continued...)

pleadings to Mr. Snyder with a note attached, stating that "[b]ecause there is a child involved in this case, you must go thru [sic] an attorney for a divorce." R.22, Ex.1. The parties do not dispute that Mr. Nolen's instruction was incorrect. The complaint further alleges that Mr. Nolen took these actions "without consulting any judge . . . as to the propriety of his actions." R.22 at 5.[2] According to the complaint, sometime after Mr. Snyder's state court pleadings were rejected and returned, his wife liquidated his non-marital assets and dissipated the proceeds.

## B.

On September 17, 1998, Mr. Snyder filed this action against Mr. Nolen pursuant to 42 U.S.C. § 1983. The complaint alleged that Mr. Nolen had violated Mr. Snyder's constitutional right of access to the courts and that, as a

---

[1] (...continued)
the records of the circuit court. The filing date of the complaint could not thereafter be changed by the clerk of the circuit court as he has no authority to do so without leave of court.").

[2] Whether Mr. Nolen's action is characterized as a refusal to file Mr. Snyder's pleadings or a removal of Mr. Snyder's pleadings from the docket, there appears to be no authority under Illinois law to justify his actions. *See infra* note 9; *cf. Ayala*, 531 N.E.2d at 1043 ("The circuit clerk's practice of filing then changing the filing dates on documents where fees were not paid created the situation in the present case. Such a practice impermissibly encroaches upon the judicial authority and casts doubt upon the reliability of the dates on which documents have been filed with his office. We point out that the clerk may refuse to accept a document unless the fee is paid (Ill.Rev.Stat. 1987, ch. 25, par. 27.1); however, where the clerk has accepted a document for filing without the fee, file stamps it and assigns a docket number, as occurred in the present case, the circuit court nevertheless acquires jurisdiction of the case.").

result of that violation, Mr. Snyder was prevented from obtaining a court order to prevent his wife from dissipating his non-marital assets. Mr. Snyder's original complaint was stricken by the district court for non-compliance with the procedural requirements of Local Rule 8.1 ("Pleadings Filed by Prisoners") because the complaint was not prepared on the court's required forms. *See* R.3.

On November 2, 1998, Mr. Snyder filed a first amended complaint. This complaint and a motion to dismiss filed by Mr. Nolen were referred to a magistrate judge. The magistrate judge recommended that Mr. Snyder's complaint be dismissed on the ground that Mr. Nolen's action was a quasi-judicial act entitled to absolute immunity. *See* R.19. Mr. Snyder timely objected to this recommendation. The district court, without considering the magistrate judge's recommendation, dismissed Mr. Snyder's complaint, with leave to re-file, on the ground that it was unclear from the complaint whether Mr. Snyder was suing Mr. Nolen in his official or individual capacity. *See* R.21.

On April 6, 2000, Mr. Snyder timely filed a second amended complaint, the pleading at issue here. In this complaint, Mr. Snyder claimed that Mr. Nolen was liable in his individual capacity for blocking Mr. Snyder's access to the Saline County Court in violation of the federal right of access to the courts. He further alleged a supplemental claim based on the Constitution of the State of Illinois. Specifically alleging the loss of his personal property, Mr. Snyder sought compensatory damages in the amount of $60,000 (the value of his dissipated assets) and punitive damages in the amount of $100.

Mr. Nolen again filed a motion to dismiss. On February 2, 2001, the magistrate judge recommended that the complaint be dismissed on three separate grounds: (1) that the complaint did not state a constitutional claim; (2) that Mr. Nolen was entitled to absolute quasi-judicial immunity; and

(3) that Mr. Nolen was entitled to qualified immunity. *See* R.33. A notice accompanied the magistrate judge's report and recommendation that notified the parties that the failure to object to the report within ten days of service "shall result in a waiver of the right to appeal all issues, both factual and legal, which are addressed in the Report and Recommendation." *Id.*

   Mr. Snyder filed no objections to the magistrate judge's report. On February 23, 2001, the district court adopted the magistrate judge's report and recommendation and granted Mr. Nolen's motion to dismiss. *See* R.34. On March 7, 2001, the district court entered judgment in favor of Mr. Nolen. *See* R.35. On March 16, 2001, Mr. Snyder filed with the district court a motion to vacate the judgment and, in the alternative, a notice of appeal. In a sworn affidavit, Mr. Snyder explained that he had just returned from a different prison facility to which he had been transferred on temporary writ status for a fitness hearing in his underlying criminal case.[3] He did not receive the magistrate judge's order until his return. By that time, the district court had entered a judgment. Mr. Snyder further stated that, prior to his transfer, he had requested that the prison warden forward his mail to his temporary address but that the prison had failed to do so. The district court denied Mr. Snyder's motion to vacate the judgment on April 2, 2001. *See* R.40. This appeal followed.

---

[3] Specifically, Mr. Snyder stated that he was transferred from the Shawnee Correctional Center to the Illinois River Correctional Center on January 3, 2001, and that he did not return to Shawnee until March 7, 2001.

## II

## DISCUSSION

### A.

We first must determine whether Mr. Snyder has waived his right to appeal. Mr. Nolen submits that, because Mr. Snyder failed to timely object to the magistrate judge's report, he has waived his right to appeal all factual and legal issues to this court. Mr. Snyder concedes that he did not object to the magistrate judge's report; however, he maintains that the interests of justice require a finding that his right to appeal has not been waived.

In *Thomas v. Arn*, 474 U.S. 140, 155 (1985), the Supreme Court held that, consistent with the requirements of due process, "a court of appeals may adopt a rule conditioning appeal, when taken from a district court judgment that adopts a magistrate's recommendation, upon the filing of objections with the district court identifying those issues on which further review is desired" so long as the rule provides "clear notice to the litigants and an opportunity to seek an extension of time for filing objections." In so holding, the Court further provided that "because [this] rule is a nonjurisdictional waiver provision, the Court of Appeals may excuse the default in the interests of justice." *Id.* In *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986), this circuit adopted such a rule, concluding that "failure to file objections with the district judge waives the right to appeal all issues, both factual and legal." However, we also recognized that "under certain circumstances the failure to file objections may be excused because the rule is not jurisdictional and should not be employed to defeat the ends of justice." *Id.* at 540 (internal quotation marks and citations omitted).

Mr. Snyder was a pro se litigant throughout the proceedings in the district court. As a general proposition, pro se litigants are subject to the same waiver rules as litigants

represented by counsel. *See Provident Sav. Bank v. Popovich*, 71 F.3d 696, 700 (7th Cir. 1995). However, we decline to apply waiver in this case because doing so would defeat the ends of justice. Shortly before the magistrate judge's report was issued and mailed to Mr. Snyder's "permanent" prison address, Mr. Snyder was transferred temporarily to a different correctional facility. Mr. Snyder requested that the prison forward his mail, but the prison failed to do so. As a result, Mr. Snyder did not receive the magistrate judge's report until after the time for objection had expired and the district court had entered judgment against Mr. Snyder.

We cannot accept Mr. Nolen's contention that waiver should be applied in this case because Mr. Snyder's failure to receive the magistrate's report was due to his own fault in failing to notify the court clerk of his change of address. The record simply will not support such a finding of fault on the part of Mr. Snyder. As a general principle, because "[t]he parties are far better situated to know of any errors in their address information," litigants, including prisoners, "bear the burden of filing notice of a change of address in such a way that will bring the attention of the court to the address change." *Theede v. United States Dep't of Labor*, 172 F.3d 1262, 1267 (10th Cir. 1999). Here, we deal with a temporary absence from a continuing address. Mr. Snyder has set forth the steps that he took to ensure that he received his mail during his absence on a temporary writ from the institution to which he was regularly assigned. Notably, the record contains no indication that Mr. Snyder in any way departed from the prison's normal course of procedure.[4] Accordingly, we decline to hold that Mr. Snyder

---

[4] The realities of prison administration require that those responsible for the administration of these institutions have significant flexibility in setting up procedures to ensure that prisoners
(continued...)

waived his right to appeal.

## B.

We next must determine whether, given the specific allegations of the complaint, Mr. Nolen may claim absolute quasi-judicial immunity.

Following the holdings of the Supreme Court of the United States,[5] we have recognized "the fundamental

---

[4] (...continued)
who are temporarily absent from their place of incarceration receive prompt notification of official correspondence. If a prison administration believes that the administrative burden of forwarding the mail of temporarily transferred prisoners is too great, it may establish a procedure requiring the prisoner to assume responsibility for making his new address known to his correspondents, including the courts in which the prisoner has cases pending. As long as the prisoner is given adequate and timely notice of his new address and an opportunity to notify the court, such a provision would impose a reasonable requirement upon the prisoner.

[5] *See Mireles v. Waco*, 502 U.S. 9, 12-13 (1991) (holding that judge's alleged action in directing officers to bring before the court an attorney who was in the courthouse was taken in judge's judicial capacity and, therefore, judge was entitled to absolute immunity even though he allegedly directed officers to carry out the order with excessive force); *Forrester v. White*, 484 U.S. 219, 225-29 (1988) (holding that judge acted in administrative capacity when he demoted and dismissed probation officer and, therefore, was not entitled to absolute immunity); *Stump v. Sparkman*, 435 U.S. 349, 362-63 (1978) (holding that judge acted in judicial capacity when he approved mother's ex parte petition to have her mentally retarded minor daughter sterilized and, therefore, was entitled to absolute immunity); *Pierson v. Ray*, 386 U.S. 547, 553-55 (1967) (holding that 42 U.S.C. § 1983 did not abolish the "settled principle" of judicial immunity and, therefore, judge could not be held
(continued...)

principle that judges are entitled to absolute immunity from damages for their judicial conduct." *Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001). The principle "is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. Accordingly, the 'touchstone' for the doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.' " *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435-36 (1993) (quoting *Burns v. Reed*, 500 U.S. 478, 500 (1991) (Scalia, J., concurring in judgment in part and dissenting in part)).

The Supreme Court has instructed that a functional approach should be taken in determining whether an individual is entitled to absolute immunity. *See Forrester v. White*, 484 U.S. 219, 224 (1988); *Cleavinger v. Saxner*, 474 U.S. 193, 201 (1985). Whether absolute immunity ought to be afforded is dependent upon the nature of the functions performed by the officer in question and "the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Forrester*, 484 U.S. at 224. "[T]he cloak of immunity is designed to prevent a situation in which decision-makers act with an excess of caution or otherwise . . . skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct out of a fear of litigation or personal monetary liability." *Tobin for Governor v. Illinois State Bd. of Elections*, 268

---

[5] (...continued)

liable for an unconstitutional conviction); *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 351 (1872) (holding that "judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly").

F.3d 517, 522 (7th Cir. 2001) (internal quotation marks and citations omitted).

These policy concerns have required that, in some instances, "[t]he absolute immunity afforded to judges [be] extended to apply to quasi-judicial conduct of [n]on-judicial officials whose official duties have an integral relationship with the judicial process." *Richman*, 270 F.3d at 435 (internal quotation marks and citations omitted); *see also In re Castillo*, 297 F.3d 940, 947 (9th Cir. 2002) ("Absolute judicial immunity is not reserved solely for judges, but extends to nonjudicial officers for 'all claims relating to the exercise of judicial functions.'" (quoting *Burns*, 500 U.S. at 499 (Scalia, J., concurring in judgment in part and dissenting in part))).

This immunity has been extended to non-judges in two circumstances. First, it has been applied to "quasi-judicial conduct," *Richman*, 270 F.3d at 435, that is, actions of non-judicial officers acting in a judicial capacity. As the Supreme Court has explained, "[w]hen judicial immunity is extended to officials other than judges, it is because their judgments are 'functional[ly] comparab[le]' to those of judges—that is, because they, too, 'exercise a discretionary judgment' as a part of their function." *Antoine*, 508 U.S. at 436 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976)).[6]

---

[6] In holding that court reporters are not protected by absolute quasi-judicial immunity, the Supreme Court in *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429 (1993), wrote:

> The function performed by court reporters is not in this category. . . . [C]ourt reporters are required by statute to "recor[d] verbatim" court proceedings in their entirety. 28 U.S.C. § 753(b). They are afforded no discretion in the carrying out of this duty; they are to record, as accurately as possible, what transpires in court. . . . In short, court reporters do not exercise the kind of judgment that is
>
> (continued...)

Absolute immunity does not extend to all positions simply "because they are part of the judicial function." *Id.* at 435 (internal quotation marks and citations omitted).

Absolute judicial immunity also has been extended to the conduct of a second group of individuals. "[W]hen functions that are more administrative in character have been undertaken pursuant to the explicit direction of a judicial officer, we have held that that officer's immunity is also available to the subordinate." *Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir. 1992). "The policy justifying an extension of absolute immunity in these circumstances is to prevent court personnel and other officials from becoming a lightning rod for harassing litigation aimed at the court." *Richman*, 270 F.3d at 435 (internal quotation marks and citations omitted). In applying this type of quasi-judicial immunity, this court further has distinguished between the court's order and the manner in which the order is enforced. *See id.* at 436. Thus, deputies who allegedly used excessive force in carrying out a judge's order to clear the courtroom were not entitled to absolute immunity; the suit challenged the way the officers enforced the order, not the order itself. *See id.* at 437-39.

Before the recent guidance of the Supreme Court in *Antoine*, we had occasion to apply these principles to clerks of court on a few occasions. In *Lowe v. Letsinger*, 772 F.2d 308, 313 (7th Cir. 1985), we noted that "a court clerk enjoys absolute immunity in rare instances where he is performing nonroutine, discretionary acts akin to those performed by judges." We then determined that absolute immunity did not apply to a clerk's involvement in the concealment of the entry of a post-conviction order "because the clerk's duty to

---

6   (...continued)
    protected by the doctrine of judicial immunity.
*Id.* at 436-37.

type and send notice after entry of judgment is a non-discretionary, ministerial task." *Id.* In *Kincaid*, we considered the issue once again. Because the clerks in *Kincaid* acted pursuant to judicial instruction when they returned the plaintiffs' complaint and filing fee and (erroneously) directed them to file in a different court, we readily concluded that the clerks' actions were protected by absolute immunity. *See Kincaid*, 969 F.2d at 601.

We have not had the opportunity to address squarely the issue presently before us—whether a clerk's refusal to file a pleading qualifies for absolute immunity in the absence of explicit judicial direction.[7] We must therefore decide

---

[7] Writing before the receipt of the more recent guidance from the Supreme Court, those circuits that have addressed the issue have reached contrary conclusions. In *Mullis v. United States Bankruptcy Court for the District of Nevada*, 828 F.2d 1385, 1390 (9th Cir. 1987), the Ninth Circuit held that clerks who initially accepted and filed an incomplete bankruptcy petition without giving proper counseling and notice regarding the chapters of the Bankruptcy Code under which the plaintiff could file and later refused to accept an amended petition were protected by absolute immunity. In so doing, the court reasoned that "[t]he commencement of an action by filing a complaint or petition is a basic and integral part of the judicial process" and "[t]he clerk of court and deputy clerks are the officials through whom such filing is done." *Id.*; *see also Smith v. Erickson*, 884 F.2d 1108, 1111 (8th Cir. 1989) (noting that "the filing of complaints and other documents is an integral part of the judicial process and that [a court clerk] would be protected by judicial immunity from damages for civil rights violations committed in connection with the performance of such tasks"). The Fourth Circuit in *McCray v. Maryland*, 456 F.2d 1, 4 (4th Cir. 1972), held, however, that "there is no basis for sheltering [a] clerk from liability under section 1983 for failure to perform a required ministerial act such as properly filing papers." The court reasoned that there was no history of extending such immunity to clerks at common law and "the threat of possible tort liability does

(continued...)

whether Mr. Nolen's actions in the present case, as described in the operative complaint, fall within one of the two categories of actions for which absolute judicial immunity has been extended to non-judges in our previous cases.

With respect to the first category, Mr. Nolen was not acting in a "functionally comparable" way to a judge. At the outset, no one suggests that, under the law of Illinois, the action of Mr. Nolen of extracting from the files of the court a previously filed case and returning it to the litigant without any judicial action having been taken can be characterized as being colorably within his authority as the clerk of a court. Indeed, it appears established that such action is beyond the authority of the clerk.[8] More importantly, on this record, we cannot say that a traditional judicial function that involves the exercise of discretion has been delegated to a subordinate court officer. As noted by the Supreme Court, the "touchstone" for applying absolute immunity has been "the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *Antoine*, 508 U.S. at 435. Here, Mr. Nolen's duty under the law of Illinois to maintain the official record was purely ministerial; he had no authority to resolve disputes between parties or to make substantive determinations on the worth or merits of a filing. In short, Mr. Nolen is charged with having breached his duty to perform the ministerial act of accepting techni-

---

[7] (...continued)
not 'unduly inhibit' the clerk in the discharge of his duties." *Id.*

[8] *See, e.g., Ayala*, 531 N.E.2d at 1043 (stating that a court clerk may refuse to accept a document unless the fee is paid, but where the clerk has accepted the document for filing without the fee, file stamps it and assigns a docket number, the court nevertheless acquires jurisdiction).

cally   sufficient   papers.[9]   The   function   re-

_____

[9] Section 13 of the Clerks of Courts Act, 705 Ill. Comp. Stat. 105/0.01 *et seq.*, sets forth the general duties of court clerks. It does not give the clerk the authority to refuse to file papers that conform to the technical rules of court. Section 13 provides in relevant part that "[t]he clerks shall attend the sessions of their respective courts, preserve all the files and papers thereof, make, keep and preserve complete records of all the proceedings and determinations thereof, except in cases otherwise provided by law, and do and perform all other duties pertaining to their offices, as may be required by law or the rules and orders of their courts respectively." 705 Ill. Comp. Stat. 105/13.  Rule 131 of the Rules of the Supreme Court of Illinois specifies the proper form of papers and appears to provide some basis for a court clerk to reject a procedurally nonconforming pleading. The rule provides:

> (a) Legibility. All papers and copies thereof for filing and service shall be legibly written, typewritten, printed, or otherwise duplicated. The clerk shall not file any which do not conform to this rule.

> (b) Titles. All papers shall be entitled in the court and cause, and the plaintiff's name shall be placed first.

> (c) Multiple Parties. In cases in which there are two or more plaintiffs or two or more defendants, it is sufficient in entitling papers, except a summons, to name the first-named plaintiff and the first-named defendant with the usual indication of other parties, provided there be added the official number of the cause.

> (d) Name, Address and Telephone Number of Responsible Attorney or Attorneys. All papers filed in any cause or served upon the opposite party shall bear the name and business address and telephone number, if any, of the responsible attorney or attorneys and the law firm filing the same, or of the party who appears in his own proper person. If service by facsimile transmission is permitted and the responsible attorney or attorneys or the party who appears in his own proper person will accept service

(continued...)

quired of him by law involves none of the discretion that the Supreme Court has told us in *Antoine* is at the heart of absolute judicial immunity.

At least on the record before us, the second category for quasi-judicial immunity is equally inapplicable to the clerk in this case. This second category includes individuals who are acting at the direction of a judicial officer. At this point in the litigation, there is no claim that Mr. Nolen was acting at the direction of any judicial officer in returning Mr. Snyder's papers.

Accordingly, we must conclude that, on this record, there is no basis for dismissal of the action on the ground of absolute quasi-judicial immunity.[10]

---

[9] (...continued)
by facsimile transmission, then the paper shall also bear the statement "Service by facsimile transmission will be accepted at [facsimile telephone number]."

Ill. S. Ct. R. 131; *see also* 1A Nichols Ill. Civ. Prac. § 11:7 ("Supreme Court Rule 131, which pertains to the preparation and form of papers in original proceedings, provides that the clerk of the court is not to file any papers which do not conform with the requirements of Rule 131 as to form.").

[10] At first glance, it may seem that our review of this case is precluded by the *Rooker-Feldman* doctrine. *See Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923). Neither the parties nor the district court addressed this issue, and we believe that they were correct in that regard. The *Rooker-Feldman* doctrine prohibits lower federal courts from engaging in appellate review of state *court* determinations. *See Young v. Murphy*, 90 F.3d 1225, 1230 (7th Cir. 1996); *Garry v. Geils*, 82 F.3d 1362, 1364 (7th Cir. 1996); *Levin v. Attorney Reg. & Disciplinary Comm'n of the Supreme Court of Illinois*, 74 F.3d 763, 766 (7th Cir. 1996). "Litigants who believe that a state judicial proceeding has violated their constitutional
(continued...)

## C.

We turn next to Mr. Nolen's claim that he is entitled on this record to qualified immunity.

Qualified immunity shields government officials from civil liability "for the performance of their discretionary functions when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The central purpose of qualified immunity is to protect public officials "'from undue interference with their duties and from potentially disabling threats of

---

[10] (...continued)

rights must appeal that decision through their state courts and then to the [United States] Supreme Court." *Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 702 (7th Cir. 1998). The specific allegation in Mr. Snyder's complaint is that Mr. Nolen, acting as the Circuit Court Clerk, refused to file or actually removed already filed papers from the court's docket. Under Illinois law, the clerk simply has the ministerial duty to file papers that conform to the technical rules of court. *See In re Estate of Davison*, 430 N.E.2d 222, 223 (Ill. App. Ct. 1981) ("Delivery alone has been held to constitute filing since the person filing has no control over the officer who receives documents. Subsequent ministerial tasks of the clerk evidence the filing of a document but are not essential to its perfection." (internal citation omitted)); *Roesch-Zeller, Inc. v. Hollembeak*, 124 N.E.2d 662, 664 (Ill. App. Ct. 1955) ("The duty of the clerk to file the document on the date it was presented to him was a ministerial act, the performance of which could be compelled by writ of mandamus."). Illinois therefore certainly would not consider Mr. Nolen's actions a "proceeding." We therefore have no occasion to address the tension between the doctrine of absolute judicial immunity and the application of the *Rooker-Feldman* doctrine to suits for damages against state judicial officers. *See Jackson v. Gardner*, No. 93-3539, 1994 WL 684041, at * 1 (7th Cir. Dec. 7, 1994).

liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow*, 457 U.S. at 806). In determining whether a defendant is entitled to qualified immunity, we engage in a two-part inquiry. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, we determine whether, taken in the light most favorable to the plaintiff, the facts alleged show that the defendant violated a constitutional right. *See id.* If a constitutional violation is shown on the basis of those facts, we then determine whether the right was clearly established at the time of the violation. *See id.* The clearly established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The plaintiff bears the burden of establishing the existence of a clearly established constitutional right. *See McGrath v. Gillis*, 44 F.3d 567, 570 (7th Cir. 1995).

We first must determine whether the complaint before us states a claim for a deprivation of the federal right of access to the courts. Mr. Snyder alleges that he was deprived of his federal constitutional right of access to the courts under the First Amendment and substantive due process when Mr. Nolen refused to file Mr. Snyder's petition for a dissolution of marriage and for a temporary restraining order against his wife.

Mr. Nolen first maintains that Mr. Snyder was not deprived of a constitutional right because a prisoner's right of access to the courts is limited to actions challenging his conviction, sentence or conditions of confinement. The members of the panel agree that Mr. Nolen's argument misconstrues the relevant Supreme Court precedent. In one line of cases, the Supreme Court has held that the fundamental right of access to the courts requires prison authorities to provide prisoners with the tools necessary "to attack their

sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Lewis v. Casey*, 518 U.S. 343, 355 (1996); *see also Bounds v. Smith*, 430 U.S. 817, 828 (1977); *Wolff v. McDonnell*, 418 U.S. 539, 579-80 (1974); *Johnson v. Avery*, 393 U.S. 483, 490 (1969). However, the Supreme Court also has held that the First Amendment right to petition the government includes the right to file other civil actions in court that have a reasonable basis in law or fact. *See McDonald v. Smith*, 472 U.S. 479, 484 (1985) ("[F]iling a complaint in court is a form of petitioning activity; but baseless litigation is not immunized by the First Amendment right to petition." (internal quotation marks and citations omitted)); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition."); *see also Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997) ("It is well established that all persons enjoy a constitutional right of access to the courts."). This parallel development of these two distinct lines of cases was recognized explicitly by our colleagues in the Sixth Circuit in *John L. v. Adams*, 969 F.2d 228 (6th Cir. 1992). That court held that "in order to assure that incarcerated persons have meaningful access to courts, states are required to provide affirmative assistance in the preparation of legal papers in cases involving constitutional rights and other civil rights actions related to their incarceration," but "in all other types of civil actions, states may not erect barriers that impede the right of access of incarcerated persons." *Id.* at 235.

The right of access to the courts is the right of an individual, whether free or incarcerated, to obtain access to the courts without undue interference. The right of individuals to pursue legal redress for claims that have a reasonable

basis in law or fact is protected by the First Amendment right to petition and the Fourteenth Amendment right to substantive due process. *See Vasquez v. Hernandez*, 60 F.3d 325, 328 (7th Cir. 1995); *see also Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993) ("Meaningful access to the courts is a fundamental constitutional right, grounded in the First Amendment right to petition and the Fifth and Fourteenth Amendment due process clauses."). The Fifth Circuit's discussion in *Jackson v. Procunier*, 789 F.2d 307 (5th Cir. 1986), is particularly instructive. In *Jackson*, a prisoner alleged that he was deprived of his constitutional right of access to the courts when personnel in the prison mailroom intentionally delayed his petition to proceed in forma pauperis and the delay resulted in the dismissal of his state appeal from an adverse civil judgment. The district court interpreted the prisoner's claim as a negligent deprivation of property without due process and dismissed the complaint for failure to state a claim because there was an adequate post-deprivation state remedy. The Fifth Circuit reversed, holding that the complaint stated a viable cause of action for the intentional deprivation of the prisoner's constitutional right of access to the courts, in violation of the First Amendment and substantive due process. *Id.* at 308. The court squarely rejected the defendants' contention that a prisoner's right of access to the courts is limited to the presentation of constitutional, civil rights and habeas corpus claims, stating that "[r]ecognition of the constitutional right of access to the courts . . . long precedes *Bounds*, and has from its inception been applied to civil as well as constitutional claims." *Id.* at 311.[11]

---

[11] Along with our colleagues in the Fourth Circuit, *see Pink v. Lester*, 52 F.3d 73, 76 (4th Cir. 1995), we have made clear that an allegation of simple negligence will not support a claim that an official has denied an individual of access to the courts. S*ee*

(continued...)

Having rejected Mr. Nolen's narrow view of prisoners' right to access, we next must consider whether the constitutional right to access is sufficiently broad to encompass Mr. Snyder's claim. For the reasons set forth in the separate opinions that follow, the majority of the panel concludes that Mr. Snyder's complaint does not state a claim for violation of his constitutional right of access to the courts. The judgment of the district court therefore is affirmed.

EASTERBROOK, *Circuit Judge*, concurring in part and concurring in the judgment. I join the Per Curiam opinion. That joint opinion leaves off at the question whether a clerk's failure to file a complaint violates the due process clause by denying the plaintiff "access" to the courts. Nolen

---

[11] (...continued)
*Kincaid v. Vail*, 969 F.2d 594, 602 (7th Cir. 1992) (holding that an isolated incident of negligence resulting in failure to file complaint did not rise to the level of a constitutional violation); *see also Lee X v. Casey*, 771 F. Supp. 725, 729 (E.D. Va. 1991) (holding that negligent conduct by deputy clerk of court in failing to file letter as a notice of appeal did not give rise to a constitutional claim for violation of access to the courts). Although the pro se complaint in this case is not a model of clarity, we believe that it cannot be characterized fairly as alleging mere negligence on the part of Mr. Nolen. *Cf. Gregory v. Nunn*, 895 F.2d 413, 415 n.2 (7th Cir. 1990) (noting in access to courts context that pleading requisite intent "need not detain our review of a Rule 12(b)(6) dismissal" and holding that the plaintiff's complaint stated a viable claim for deprivation of the right of access to the courts).

returned Snyder's complaint; this was a mistake as a matter of Illinois law. But errors of state law differ from offenses against the Constitution. Clerks (and judges too) are fallible; litigants have "access" to the court when there are avenues to correct mistakes.

What Nolen did has parallels in many courts' practice. The Clerk of the Supreme Court returns, without filing, petitions that he believes to be untimely or procedurally deficient, see Sup. Ct. R. 1.1, and until a recent amendment to Fed. R. Civ. P. 5(e) clerks of other federal courts screened documents for compliance with the federal rules and returned those that flunked. (The Clerk of the Supreme Court of Illinois still has that authority. Ill. Sup. Ct. R. 131(a).) How can those gatekeeping steps, or Nolen's similar act, be thought to deprive anyone of "access" to the courts, given the litigant's opportunity to ask a judge to direct the clerk to accept and file the paper? It won't do to say that Nolen's action was *ultra vires* while the Clerk of the Supreme Court is authorized to return petitions. No public employee is authorized to err, but all do occasionally; the Clerk of the Supreme Court can slip up in thinking a given petition deficient. The question is whether a public employee's gaffe in the application of state rules violates the fourteenth amendment. That question has an established, and negative, answer. See, e.g., *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 202 (1989); *Snowden v. Hughes*, 321 U.S. 1, 11 (1944); *Archie v. Racine*, 847 F.2d 1211, 1215-18 (7th Cir. 1988) (en banc).

A forum that offers an opportunity to be heard before a decision becomes final provides due process of law. Litigants disappointed by the acts of a court's administrative staff have that opportunity. The Supreme Court entertains motions to direct its Clerk to file documents. See Sup. Ct. R. 21. Only if the staff prevented the judiciary from seeing such a request would there be a plausible claim that the

litigant lacked access to the courts. Yet Snyder does not contend that Nolen would have refused to transmit a motion to a judge. Illinois authorizes judges to direct clerks to file papers they have returned. 705 ILCS 25/11. Cf. *Doe v. Carlson*, 250 Ill. App. 3d 570, 619 N.E. 2d 906 (2d Dist. 1994). As Nolen blundered by returning Snyder's complaint, a judge would have fixed things pronto. Instead of filing a motion in state court, however, Snyder filed this federal suit demanding money from the clerk. He is in the wrong judicial system, seeking the wrong relief. Perhaps his lack of counsel in the state litigation is responsible. Snyder's status as a legal amateur does not, however, excuse his failure to take the steps provided or required by the judicial system. See *McNeil v. United States*, 508 U.S. 106, 113 (1993). His ignorance of the right way to proceed certainly does not support an award of damages against a clerk of court.

My point is not that the opportunity to litigate in state court is the process "due" for a completed wrong, à la *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984). That would pose the question whether, after *Christopher v. Harbury*, 536 U.S. 403 (2002), and *Lewis v. Casey*, 518 U.S. 343 (1996), access to the courts is a procedural entitlement, to which *Parratt* and its successors apply, or a substantive entitlement, to which they do not. Instead my point is that opportunities to correct mistakes before a suit reaches its conclusion means that there is no constitutional problem in the first place. To see this consider an example. The clerk must notify the parties immediately on entering judgment, as the time to appeal starts with entry. Sometimes, however, a clerk neglects that duty. It was established doctrine for many years that litigants (and their lawyers) are responsible for checking the docket to see whether a decision has been made, and that they can't take a late appeal if the clerk errs. Today Fed. R. App. P. 4(a)(6) allows reopening if the losing side acts within 180 days;

thereafter the judgment is beyond review. Each litigant's opportunity to protect his interests within the case itself—by checking the docket often enough to make a motion under Rule 4(a)(6) (and before that, by checking the docket every 30 days)—means that the clerk's error does not deny anyone "access to the courts." Just so here. Snyder could have asked a judge to direct Nolen to file the pleading. That option provides ready access to the courts.

Suppose that Nolen had accepted Snyder's pleading and that the judge had immediately dismissed it for failure to state a claim, with the notation "[b]ecause there is a child involved in this case, you must go thru [sic] an attorney for a divorce." (This is the same language Nolen used.) Suppose further that Snyder had not asked for reconsideration— or had appealed but not asked for expedition, and that his spouse had squandered the assets before the appellate court reversed. Would we say "Snyder suffered a denial of his constitutional right of access to the courts, but judicial immunity blocks relief"? I do not think so. We would say that the opportunity to protest the initial misstep *is* the access to the courts that the Constitution guarantees. Access neither implies nor ensures an error-free process. Here the clerk rather than the judge made the notation, but the case was just beginning; Snyder had many options. Electing to let the blunder stand without protest does not bootstrap a mistake into a constitutional violation. The State of Illinois did not deprive Snyder of "access" to its courts; rather, it made an error in handling his suit. Errors in the course of litigation may justify motions and appeals; they do not support damages litigation under the federal Constitution.

KANNE, *Circuit Judge*, concurring in part and concurring in the judgment. I join the Per Curiam opinion. However, I do agree with my colleague, Judge Ripple, that *Christopher*

*v. Harbury*, 536 U.S. 403 (2002) provides the template for the analysis of this case, and therefore find compelling a good portion of his separate opinion carefully laying out *Christopher*'s approach to determining whether a complaint states a right-to-access claim (*see* dissenting opinion, section I. A.) and applying *Christopher* to the matter before us (*see id.* at sections I. B. 1. and 2.). I also agree with Judge Ripple's discussion of the distinction between *Christopher* and *Parrett v. Taylor*, 451 U.S. 527 (1981) (*see id.* at section I. B. 3. a.).

Where Judge Ripple and I part company is in the application of the third prong of the *Christopher* test for determining whether Mr. Snyder's second amended complaint states a right-to-access claim (*see id.* at section I. B. 3. b.). As Judge Ripple cogently explains, that third element requires Mr. Snyder to request a remedy awarded as recompense for the denial of access to the courts (and, hence, the frustration of his underlying claim), but that remedy must not otherwise be available through other litigation. *Christopher*, 536 U.S. at 415. Unlike Judge Ripple, I do not believe Mr. Snyder has met this threshold based on the facts of this case—facts that in salient respects mirror those of the unsuccessful plaintiff in *Christopher*.

Mr. Snyder sought, as relief in his underlying claim against his then-wife, a temporary restraining order preventing her from dissipating his assets allegedly covered by a valid prenuptial agreement. This form of relief—which seeks, at a specific moment in time, to stop the defendant's adverse behavior—is similar to the injunction sought by the plaintiff in *Christopher*. There, the plaintiff claimed that the relief she would have sought in the underlying action against the government, had she not been frustrated by its deceptive and misleading statements, was an injunction preventing her husband's murder. *Id.* at 419.

The *Christopher* Court recognized that the plaintiff's right-to-access claim, brought *after* her husband's death, could not possibly provide her the relief she would have originally sought—an injunction stopping his murder. As the Court stated:

> It is true that she cannot obtain in any present tort action the order she would have sought before her husband's death, the order that might have saved her husband's life. But neither can she obtain any such order on her access claim, which therefore cannot recompense [her] for the unique loss she claims as a consequence of her inability to bring an [ ] action earlier.

*Id.* at 421-22. Because that time-sensitive opportunity was lost forever, all that remained to compensate the plaintiff for the alleged denial of access to the courts was primarily money damages. That, the Court determined, was available through other causes of action already pending against the government, thus eliminating any basis for a separate right-to-access claim. *Id.* at 422.

Like the plaintiff in *Christopher*, Mr. Snyder claims he has lost the time-sensitive opportunity to prevent his former wife from dissipating his assets. That moment being gone, what he attempts to recover in his right-to-access suit is money damages equal to his lost property. Yet, the relief he now seeks on his federal constitutional access claim was obtainable in state court through other non-constitutional claims against his former wife, such as a suit for breach of the prenuptial agreement. Under such circumstances, where more than one avenue remained open for the recovery of monetary damages at the time of the filing of the constitutional access claim, Mr. Snyder was, *ipso facto*, not deprived of his constitutional right of access to the courts.

Although this case was disposed of in the district court on other grounds, the dismissal of Mr. Snyder's second

amended complaint was proper under the third prong of *Christopher*, as described above.

RIPPLE, *Circuit Judge*, dissenting. Because I believe that Mr. Snyder's complaint states a claim for a constitutional violation of his right to access to the courts and that Mr. Nolen is not entitled to qualified immunity on that claim, I respectfully dissent.

**I**

**A.**

Recent Supreme Court guidance, not available to my colleague in the district court at the time of his decision, sets forth criteria that a court must consider in determining whether a plaintiff has set forth a viable claim of right to access to the courts. Specifically, in *Christopher v. Harbury*, 536 U.S. 403 (2002), the Supreme Court had occasion to delineate with more precision than in its earlier cases the requirements for stating a viable cause of action for deprivation of the right of access to the courts. In *Christopher*, the widow of a murdered Guatemalan citizen brought a *Bivens* action in which she alleged, among other things, that certain federal officials had concealed and covered up information regarding her husband's kidnaping, torture and death. She further alleged that this concealment had denied her the right of access to the courts. The complaint, brought after the husband's death, alleged that the official deception had denied the plaintiff access to the courts "by leaving her

without information, or reason to seek information, with which she could have brought a lawsuit that might have saved her husband's life." *Id.* at 405. The Supreme Court held that the complaint did not state an actionable claim for denial of access to the courts for two reasons: (1) the complaint failed "to identify an underlying cause of action for relief that the plaintiff would have raised had it not been for the deception alleged," and (2) the plaintiff failed "to seek any relief presently available for denial of access to courts that would be unavailable otherwise." *Id.* at 405-06.

Noting that its decisions have grounded the right of access to the courts in the Article IV Privileges and Immunities Clause, the First Amendment, and the Due Process Clauses of the Fifth and Fourteenth Amendments, *see id.* at 415 n. 12, the Court further observed that access-to-courts claims fall into two categories. One type seeks to eliminate "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Id.* at 413. The Court explained that, in cases of this sort, "[t]he opportunity has not been lost for all time, [ ] but only in the short term; the object of the denial-of-access suit, and the justification for recognizing that claim, is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* The second type aims to compensate a plaintiff for wrongful official conduct that has caused the plaintiff to lose a litigation opportunity. *See id.* at 413-14. "The official acts claimed to have denied access may allegedly have caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief." *Id.* at 414 (internal citations omitted). The Court explained that "[t]hese cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable. The ultimate object of

these sorts of access claims, then, is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future." *Id.* (internal footnotes omitted).

In either case, "the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414-15. The Court made clear that, in all cases, the constitutional right of access to the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court," and thus, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id.* at 415. The Court also made clear that, when the access claim looks backward to a lost litigation opportunity, "the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.* The Court reasoned that there is "no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.*

Applying these standards to the facts in *Christopher,* the Court determined that the plaintiff's complaint "did not come even close to stating a constitutional claim for denial of access upon which relief could be granted." *Id.* at 418. First, "the complaint failed to identify the underlying cause of action that the alleged deception had compromised, going no further than the protean allegation that the State Department and NSC defendants' 'false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress.'" *Id.* The complaint left the court and the defendants "to guess at the unstated cause of action supposed to have been lost, and at the rem-

edy being sought independently of relief that might be available on the 24 other counts set out in the complaint." *Id.* Second, even if the court of appeals accepted the plaintiff's allegation during oral argument that she "would have brought an action for intentional infliction of emotional distress as one wrong for which she could have sought the injunctive relief that might have saved her husband's life," *id.* at 419, the plaintiff "could not satisfy the requirement that a backward-looking denial-of-access claim provide a remedy that could not be obtained on an existing claim," *id.* at 420-21. The Court reasoned that the plaintiff's complaint presently included a claim for intentional emotional distress and that she could seek damages based on this cause of action. *See id.* at 421. The Court recognized that the plaintiff could not "obtain in any present tort action the order she would have sought before her husband's death, the order that might have saved her husband's life." *Id.* However, the Court pointed out that "neither can she obtain any such order on her access claim, which therefore cannot recompense [the plaintiff] for the unique loss she claims as a consequence of her inability to bring an intentional-infliction action earlier." *Id.* at 421-22. Because "the access claim [could not] address any injury she has suffered in a way the presently surviving intentional-infliction claims cannot," the plaintiff was "not entitled to maintain the access claim as a substitute, backward-looking action." *Id.* at 422.

In sum, in order to state a claim for backward-looking denial of access under *Christopher*, a party must identify in the complaint: (1) a nonfrivolous, underlying claim, (2) the official acts frustrating the litigation, and (3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit. *See id.* at 415; *see also Neaves v. City of San Diego*, No. 02-55512, 2003 WL 21500201, at *1 (9th Cir. June 27, 2003).

**B.**

### 1. Underlying claim

With these principles in mind, I turn to the facts of the case at hand. In *Christopher*, the Court made clear that, in a backward-looking access case such as this one, the complaint must state the underlying claim in accordance with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure to the same degree as if the underlying claim was being pursued independently. *See Christopher*, 536 U.S. at 417. In short, the complaint must set forth a "short and plain statement of the claim." *Id.* at 418 (quoting Fed. R. Civ. P. 8(a)). *Christopher* thus requires that the underlying cause of action "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant." *Id.* at 416. The statement also must be sufficiently specific to ensure that the district court can ascertain that the claim is not frivolous and that the "the 'arguable' nature of the underlying claim is more than hope." *Id.*

Upon examination of the complaint, I believe that Mr. Snyder has met this requirement of *Christopher.* In his second amended complaint, Mr. Snyder alleged that he had attempted to file a petition for dissolution of marriage and a temporary restraining order to prevent his wife "from illegally dissipating his assets, all being covered by a fully executed prenuptial agreement." R.22. Mr. Snyder further alleged that he "had attached the proper filing fee" and that "there was no constitutionally permissible reason for defendant Nolen to refuse to file plaintiff's case." *Id.* Furthermore, Mr. Snyder attached to his second amended complaint the pleadings that he had attempted to file in the state court. In these documents, Mr. Snyder alleged that his wife was "guilty of extreme and repeated mental cruelty in that she refuses to speak or correspond with [him], and had refused to send money to [him] despite his $350/month mortgage payments," that his wife was "in sole possession of all the property to which [he] claim[ed] as his pursuant

to the referenced prenuptial agreement," that he had "revoked a Power of Attorney given to [his wife], but [she] retain[ed] the document purporting to give her power of attorney over [his] affairs," that his wife had "indicated to [his] friends that she would sell some of [his property], despite agreements not to sell anything without prior authorization from [Snyder]," and that he would "suffer irreparable injury if such temporary restraining order is not granted." *Id.* These allegations, which properly are considered part of Mr. Snyder's complaint,[1] are certainly sufficient to identify the underlying claim in which access to the state court allegedly was denied.

### 2. Official acts

The second requirement articulated in *Christopher* is also met in the present case. Mr. Snyder's complaint clearly alleges the official acts that frustrated the underlying litigation. Specifically, the complaint alleges that Mr. Nolen removed Mr. Snyder's pleadings from the court's docket and returned them to Mr. Snyder with a note attached that stated that "[b]ecause there is a child involved in this case, you must go thru [sic] an attorney for a divorce." R.22. The complaint further alleges that "[t]here existed no written nor official policy that a similarly situated person as the plaintiff had to have an attorney to file a dissolution action when a child was involved," and that Mr. Nolen had removed Mr. Snyder's pleadings from the court's docket

---

[1] *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 753 (7th Cir. 2002) (stating that the complaint includes any exhibits attached thereto); *Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir. 1988) (same); *Moran v. London Records, Ltd.*, 827 F.2d 180, 181 (7th Cir. 1987) (same); *English v. Local Union No. 46*, 654 F.2d 473, 477 (7th Cir. 1981) (same).

"without consulting any judge [or] state attorney as to the propriety of his actions in denying plaintiff's access to court." *Id.*

### 3. Remedy available

Finally, *Christopher* requires that we consider whether Mr. Snyder's complaint identifies, at the level of specificity required by Rule 8 (a), *see Christopher*, 536 U.S. at 417-18, a remedy that may be awarded as recompense in a denial-of-access case that would not be available in any other future litigation.

This requirement of *Christopher* requires that a court ascertain whether the plaintiff can maintain any other action against the defendant who caused the deprivation alleged in the underlying cause of action. If such a cause of action exists and if the plaintiff can bring such a cause of action to achieve the remedy sought in the underlying cause of action, there is no remedy unique to a right-of-access claim. In *Christopher*, for example, the plaintiff was unable to describe any relief that she could get through the maintenance of a right-of-access claim that she could not get from her still viable causes of action against the original defendants. Here, Mr. Snyder must demonstrate that he can obtain a remedy in this denial-of-access claim that he could not receive through the maintenance of another cause of action against his former wife.

### a. Distinction between *Christopher* and *Parratt v. Taylor*

This requirement, although superficially similar to the paradigm employed in the procedural due process context, *see Parratt v. Taylor*, 451 U.S. 527 (1981); *Easter House v. Felder*, 910 F.2d 1387 (7th Cir. 1990) (en banc), is analytically quite distinct. Indeed, the Court in *Christopher* understandably makes no allusion to these due process cases.

*Parratt* and its progeny stand for the proposition that a random and unauthorized deprivation of property by a state employee does not constitute a violation of procedural due process so long as the state provides a meaningful post-deprivation remedy for the loss. The paradigm is based on the premise that a denial of due process does not take place unless and until there has been the denial of an adequate state remedy against the individual who has caused the deprivation. By contrast, the paradigm employed by the Supreme Court in the denial-of-access context of *Christopher* asks not whether there is an alternate remedy against the individual who has denied access to the court, but whether there remains, despite the denial of access, a viable alternative remedy against the alleged wrongdoer identified in the *original* suit.

This distinction is quite compatible with the well-established case law before *Christopher*, a jurisprudence that the Supreme Court quite appropriately left undisturbed in *Christopher.* Specifically noting that it had surveyed the jurisprudence of the lower courts dealing with the right of access to the courts, *see Christopher*, 536 U.S. at 413, the Justices left undisturbed the significant body of circuit case law that had held that the paradigm of *Parratt* is not applicable to actions alleging a denial of the right of access to courts.[2]

---

[2] Several circuits have held that *Parratt* "is irrelevant when the plaintiff has alleged a violation of some substantive constitutional proscription." *Augustine v. Doe*, 740 F.2d 322, 329 (5th Cir. 1984) (refusing to extend *Parratt*'s exhaustion of state remedies requirement to a substantive due process claim premised on a violation of the Fourth Amendment); *see also Kauth v. Hartford Ins. Co. of Illinois*, 852 F.2d 951, 958 (7th Cir. 1988) ("[I]f substantive constitutional rights are violated, the constitutionally recognized deprivation is complete at the time of the action, irre-

(continued...)

---

[2]  (...continued)
spective of the procedures available before or after the depriva-
tion." (internal quotations omitted)); *Morello v. James*, 810 F.2d
344, 348 (2d Cir. 1987) ("Intentional substantive violations of
constitutional rights are not subject to the rule of *Parratt*."); *Pruitt
v. City of Montgomery*, 771 F.2d 1475, 1484 n.19 (11th Cir. 1985)
("[I]t is clear that the rationale of *Hudson [v. Palmer*, 468 U.S. 517
(1984),] and *Parratt* does not apply to alleged violations of substan-
tive constitutional rights, such as the Fourth Amendment rights
implicated here.").

*Parratt* has been limited to the area of procedural due process.
The case law of this court admits to but one exception to ths rule.
In order to not eviscerate the holding of *Parratt*, we have held that
"[w]hen a plaintiff brings a substantive due process claim
predicated on the deprivation of a state-created property interest,
she must show that the state violated some other substantive con-
stitutional right or that state law remedies are inadequate." *Veterans
Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003); *see
also Gable v. City of Chicago*, 296 F.3d 531, 541 (7th Cir. 2002); *New
Burnham Prairie Homes, Inc. v. Vill. of Burnham*, 910 F.2d 1474,
1480 (7th Cir. 1990); *Kauth*, 852 F.2d at 958. In these cases, it is
sound to impose the additional requirement because the substan-
tive right "comes not from the Constitution, but from state law."
*Schaper v. City of Huntsville*, 813 F.2d 709, 718 (5th Cir. 1987).

Indeed, many circuits squarely have held that *Parratt* does not
apply to claims for denial of access to the courts. *See Zilich v.
Lucht*, 981 F.2d 694, 696 (3d Cir. 1992) ("Where, as in the case at
hand, a prisoner's complaint alleges the taking of *legal* property
that results in the denial of his access to the courts, the *Parratt/
Hudson* analysis cannot, and does not, apply."); *Harrison v.
Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 n.10 (8th
Cir. 1986) ("Since the Harrisons have alleged a violation of a
substantive constitutional right independent of the Fourteenth
Amendment due process clause *simpliciter*, the existence of an
adequate state remedy under the *Parratt* analysis is irrelevant.");
*Simmons v. Dickhaut*, 804 F.2d 182, 185 (1st Cir. 1986) ("That
Simmons' legal *property* was *taken* does not convert this case to a
(continued...)

---

[2] (...continued)
procedural due process/deprivation of property claim. It is decisive that the harm complained of is not simply the taking of property, protected by the due process clause, but the taking of legal property resulting in denial of access to the courts, protected as a substantive, constitutional right. And the *Parratt* analysis does not apply where the alleged violation concerns a substantive, fundamental right." (internal citation omitted)); *Jackson v. Procunier*, 789 F.2d 307, 310 (5th Cir. 1986) (holding that *Parratt* does not apply to a claim for intentional denial of access to the courts). The only opinion that is directly to the contrary is a concurring opinion from the Sixth Circuit. In *Skewel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997), the plaintiff alleged that the defendants denied her access to the courts by concealing certain evidence relating to her husband's death. The court held that the plaintiff's failure to make some attempt to gain access to the courts prevented her recovery. *See id.* at 1264. The court reasoned that "[a] plaintiff cannot merely guess that a state court remedy will be ineffective because of a defendant's actions. Rather, the plaintiff must present evidence that the defendant's actions actually rendered any available state court remedy ineffective." *Id.* In a concurring opinion, Judge Merritt criticized the court for failing to make clear that the rationale of *Parratt* applies with equal force to right-of-access claims. He reasoned:

> The standard for a "right-of-access-to-the-courts" claim, whether treated under the First Amendment as part of the right "to petition the government for a redress of grievances" or as a procedural due process claim, should require that the plaintiff allege and prove that the state's judicial process does not provide fair procedures to remedy the wrong alleged. Proof of the lack of adequate state remedies is required by *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed. 393 (1984), and *Vicory v. Walton*, 721 F.2d 1062 (6th Cir. 1983), in procedural due process cases and should be required in judicial access cases. It seems elementary that the federal right of access to the courts is not abridged when the state courts remain just

(continued...)

This reading of *Christopher* is also consistent with the Supreme Court's overall approach in *Christopher.* In *Christopher*, the plaintiff had several claims pending against the defendants for direct harm (including intentional infliction of emotional distress) in addition to her denial-of-access claim. The plaintiff's denial-of-access claim was not premised on the loss of an opportunity to sue, but rather, on "the loss of an opportunity to seek some particular order of relief." *Id.* at 414. Although the plaintiff could not "obtain in any present tort action the order she would have sought before her husband's death, the order that might have saved her husband's life," neither could she "obtain any such order on her access claim." *Id.* at 421. Thus, any relief the plaintiff could obtain on her access claim, she also could obtain on the counts for direct harm currently pending against the defendants in the district court.

### b.   Remedy available to Mr. Snyder

I believe that Mr. Snyder, acting pro se, and without the guidance of *Christopher*, which was rendered long after the district court ruled, has met, albeit minimally, the requirement that he show that the remedy he seeks in this denial-of-access case is not available to him in a lawsuit against his former wife. In this respect it must be recalled that, in his initial complaint in state court, Mr. Snyder sought immediate injunctive relief against his then-wife on the ground that she was in sole possession of his assets, had a power of attorney and, unless stopped by a judicial order, would dissipate those assets. Despite the laconic nature of his pro se complaint, Mr. Snyder did state in his brief in

---

[2] (...continued)
        as open to provide a remedy as the federal courts.

*Id.* at 1265 (Merritt, J., concurring).

opposition to Mr. Nolen's motion to dismiss that a writ of mandamus "would not have been effective as plaintiff's former wife is believed to have liquidated and dissipated assets at the time plaintiff attempted to obtain the requested relief and she left the jurisdiction of Saline County within a few months thereafter." R.27. This court has held that "facts alleged in a brief in opposition to a motion to dismiss (indeed, even facts alleged for the first time on appeal) as well as factual allegations contained in other court filings of a *pro se* plaintiff may be considered when evaluating the sufficiency of a complaint so long as they are consistent with the allegations of the complaint." *Gutierrez v. Peters*, 111 F.3d 1364, 1367 n.2 (7th Cir. 1997).[3] I believe that these allegations, when read as we must read pro se submissions, adequately set forth Mr. Snyder's allegations that Mr. Nolen's actions deprived him of a time-sensitive opportunity to secure his assets before they were dissipated by his former wife. In short, Mr. Snyder has alleged that, because he was unsuccessful in obtaining immediate judicial control of his property because of Mr. Nolen's actions, he has suffered an injury that only can be remedied completely by a denial-of-access action against Mr. Nolen. At this stage of the proceedings, the court must accept this allegation.[4]

---

[3] *See also Murphy v. Walker*, 51 F.3d 714, 718 n.8 (7th Cir. 1995) ("[W]e may, when reviewing 12(b)(6) dismissals, consider new factual allegations raised for the first time on appeal provided they are consistent with the complaint." (internal quotation marks omitted)); *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992) ("[T]he court should consider allegations contained in the other court filings of a *pro se* plaintiff, such as those in Swofford's Objections to the Report and Recommendation of the magistrate judge.").

[4] The burden of proving the inadequacy of other relief falls on Mr.
(continued...)

## C.

### 1. Causation requirement

Having explored the requirements of *Christopher,* there remains one more issue that we must confront with respect to the adequacy of the allegation of a denial of access to the courts. As we have noted earlier, the case law requires that a plaintiff establish that he actually was injured by the activity that constituted the denial of access. Here, Mr. Snyder will have to demonstrate at some point in the litigation that the alleged harm was caused by the alleged action of Mr. Nolen rather than as a result of his own failure to seek immediate redress from Mr. Nolen's decision through a petition for writ of mandamus to the state trial court. Our case law makes clear that the imposition of an exhaustion requirement on a fundamental right such as the constitutional right of access to the courts is not permissible. *See Kauth v. Hartford Ins. Co. of Illinois*, 852 F.2d 951, 958 (7th Cir. 1988) ("[I]f substantive constitutional rights are violated, the constitutionally recognized deprivation is complete at the time of the action, irrespective of the procedures available before or after the deprivation." (internal quotations omitted)). Nevertheless, the Supreme

---

[4] (...continued)

Snyder. If the parties were to discover, either through the deposition of Mr. Snyder's former wife and/or a subpoena duces tecum served upon her pursuant to Federal Rule of Civil Procedure 45, that she has not "dissipated" Mr. Snyder's assets, or that she retains sufficient assets to compensate Mr. Snyder for his loss, then Mr. Snyder would be able to secure adequate relief through other means. In that event, the evidence would not substantiate Mr. Snyder's allegation that he has suffered an injury which can be remedied only through a denial-of-access action, and Mr. Nolen would be entitled to judgment as a matter of law. Indeed, although in my opinion not susceptible to dismissal, this matter may well be susceptible to resolution at summary judgment.

Court has acknowledged that a showing of "actual injury" is a prerequisite to the maintenance of a cause of action for denial of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996).

In *Lewis*, the Supreme Court held that an inmate claiming denial of access to the courts "cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* at 351. Instead, the inmate "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* Expounding upon the type of injury that would satisfy this requirement, the Court stated: "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." *Id.*

Following *Lewis*, this court stated in *Tarpley v. Allen County*, 312 F.3d 895, 899 (7th Cir. 2002), that no violation of the right of access to the courts occurs "in the absence of actual injury, by which [the Supreme Court] means the hindrance of efforts to pursue a nonfrivolous legal claim." Applying this standard, the court went on to hold that "[w]hile the jail's lack of resources might have posed a theoretical problem, . . . without evidence that the defendants prevented him from pursuing a nonfrivolous legal action, he cannot show that his constitutional right was violated." *Id.* Similarly, in *May v. Sheahan*, 226 F.3d 876, 883 (7th Cir. 2000), we stated that, in order to prove a violation of the right of access to the courts, "a plaintiff must demonstrate that state action hindered his or her efforts to

pursue a nonfrivolous legal claim and that consequently the plaintiff suffered some actual concrete injury." Applying this standard, the court held that the plaintiff's allegation that he "has been detained longer than would otherwise be necessary if he could go to court" was "sufficient to state an access to the courts claim." *Id.* Although these cases fall within the first category of denial-of-access cases as *Christopher* describes them, *see Christopher*, 536 U.S. at 413-14, this fundamental requirement that the plaintiff show that he was harmed by the actions of the defendant endures.

### 2. Application

Mr. Nolen's alleged act of removing Mr. Snyder's pleadings from the court's docket clearly hindered Mr. Snyder's efforts to pursue a nonfrivolous legal claim. It is not clear, however, that Mr. Nolen's act was sufficient to cause Mr. Snyder "actual injury." Illinois provides its litigants with a specific remedy through a writ of mandamus to address situations such as the one that Mr. Snyder allegedly faced when Mr. Nolen withdrew his papers without the court's permission. *See* 705 Ill. Comp. Stat. 25/11. Although Mr. Snyder makes no reference to this remedy in his second amended complaint, he did state in his brief in opposition to Mr. Nolen's motion to dismiss that a writ of mandamus "would not have been effective as plaintiff's former wife is believed to have liquidated and dissipated assets at the time plaintiff attempted to obtain the requested relief and she left the jurisdiction of Saline County within a few months thereafter." R.27. As noted earlier, facts alleged in a brief in opposition to a motion to dismiss may be considered in assessing the adequacy of the complaint. Thus, I believe that Mr. Snyder's complaint alleges, albeit minimally, that it was Mr. Nolen's action that deprived Mr. Snyder of the opportunity to obtain viable relief from the state court. Need-

less to say, an allegation is hardly proof, but at this stage of the proceedings, the pleading is adequate to avoid dismissal.

## II

Because I believe that at least at the pleading stage, the operative version of the complaint states adequately the deprivation of the federal constitutional right of access to the courts, I also would reach the question of qualified immunity—whether the law was sufficiently clear, at a meaningful level of generality, that the alleged actions of Mr. Nolen amounted to a deprivation of Mr. Snyder's right of access to the courts. As of 1996, it was clearly established by Supreme Court precedent that the First Amendment right to petition the government includes the right to file civil actions that have a reasonable basis in law or fact. Also, lower court cases, including *John L. v. Adams*, 969 F.2d 228 (6th Cir. 1992), and *Jackson v. Procunier*, 789 F.2d 307 (5th Cir. 1986), made clear that this right extended to prisoners, and there was no reason to believe otherwise. There is certainly no more direct way to interfere with a plaintiff's access to the courts than to refuse to file his pleadings or to remove them from the docket once filed.

## Conclusion

For these reasons, I would reverse the judgment of the district court and remand the case to the district court for further proceedings.

A true Copy:

    Teste:

 

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*