# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 23-1547

RICHARD J. LEY, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued September 18, 2024                                      Decided January 2, 2025)

*Lea Suarez*, of Arlington, Virginia, for the appellant.

*Shannon E. Leahy*, with whom *Richard H. Hipolit*, Deputy General Counsel for Veterans Programs; *Mary Ann Flynn*, Chief Counsel; and *James B. Cowden*, *Jr.*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before ALLEN, *Chief Judge*, and FALVEY and JAQUITH, *Judges*.

ALLEN, *Chief Judge*, filed the opinion of the Court. JAQUITH, *Judge*, filed a dissenting opinion.

ALLEN, *Chief Judge*: In 38 U.S.C. § 5110, Congress provides that, subject to limited statutory modifications, the effective date for an award of VA benefits generally can't be earlier than the date of VA's receipt of a claimant's application for compensation.[1] This appeal calls on us to decide whether a claimant may receive an effective date for benefits earlier than provided under section 5110 based on either the doctrine of equitable estoppel or constitutional principles. And to do so, we must unpack the Federal Circuit's recent—and fractured—en banc decision in *Taylor v. McDonough*.[2]

Appellant Richard J. Ley served the Nation honorably in the United States Marine Corps from October 1962 to December 1966, earning the Good Conduct Medal, the Vietnam Service

---

[1] *See* 38 U.S.C. § 5110(a)(1). In full, section 5110(a)(1) provides that "[u]nless specifically provided otherwise in this chapter, the effective date of an award based on an initial claim, or a supplemental claim, of compensation, dependency and indemnity compensation, or pension, shall be fixed in accordance with the facts found, but shall not be earlier than the date of receipt of application therefor."

[2] 71 F.4th 909 (Fed. Cir. 2023) (en banc).

Medal, as well as the National Defense Service Medal.[3] In this appeal, which is timely and over which the Court has jurisdiction,[4] he challenges a December 8, 2022, decision of the Board of Veterans' Appeals denying entitlement to an effective date before January 29, 2015, for an award of service connection for chronic lymphocytic leukemia (CLL).[5] The Board denied appellant's request for an earlier effective date, applying the general rule under section 5110 based on the date VA received his application for benefits , then applying the 1 year look back rule under 38 C.F.R. § 3.114 to reach an effective date not before January 29, 2015.[6]

Appellant does not contest the Board's analysis of the effective date to which he is entitled under section 5110.[7] Instead, appellant raises two nonstatutory bases on which he maintains he is entitled to an effective date before January 29, 2015, for the award of service connection for CLL. One of appellant's arguments is that VA is equitably estopped from enforcing section 5110's effective date limits because the Agency's actions, in particular the alleged withholding of information from him about CLL, prevented him from filing a claim any earlier than he did.[8] Appellant's other argument is that section 5110's effective date limitations are unconstitutional as applied to his situation because VA actively interfered with his right of access to the benefits system when Agency medical personnel failed to properly inform him of a CLL diagnosis before January 2016.[9]

Neither of appellant's contentions are persuasive. First, appellant's equitable estoppel argument is directly foreclosed under *Taylor*, in which a majority of the en banc Federal Circuit unambiguously held that "equitable estoppel is not available to override the claim-filing effective-date limits of [section] 5110."[10] Even if we agreed with appellant as a general matter about equitable estoppel, we are bound by the Federal Circuit's majority opinion in *Taylor*.[11] Second, as

---

[3] Record (R.) at 2267.

[4] *See* 38 U.S.C. §§ 7252(a), 7266(a).

[5] R. at 5-12.

[6] R. at 8-9.

[7] Because he does not raise any argument about the Board's analysis under section 5110, appellant has abandoned any appeal of that issue. *See Pederson v. McDonald*, 27 Vet.App. 276, 281-86 (2015) (en banc).

[8] *See* Appellant's Brief (Br.) 12-23.

[9] *Id*. at 7-12.

[10] *Taylor*, 71 F.4th at 927-28.

[11] *Id*.

we explain below, *Taylor* does not establish a binding rule about as-applied constitutional challenges under section 5110. However, we independently reach the same conclusion as the *Taylor* plurality did—that section 5110 is potentially subject to an as-applied constitutional challenge.

Nevertheless, appellant can't prevail because his right-of-access claim falls well short of the kind of extraordinarily rare circumstance that could justify a court ordering the assignment of an effective date outside the parameters Congress set forth in section 5110.[12] Because both of appellant's grounds for circumventing section 5110 are unsuccessful, and he has abandoned any other grounds for challenging the Board decision on appeal, we will affirm the Board's December 8, 2022, decision finding that appellant is not entitled to an effective date before January 29, 2015, for service connection for CLL.

## I. BACKGROUND
### A. Factual and Procedural History

Appellant served honorably in the United States Marine Corps from October 1962 to December 1966, with service in Vietnam where he is presumed to have been exposed to herbicides including Agent Orange.[13] In August 2009, appellant went to the Veterans Affairs Medical Center (VAMC) in West Palm Beach, Florida, for a physical and blood work, reporting persistent fatigue.[14] He was instructed to report annually for blood work and examination.[15] When appellant received his yearly check-up in 2010, in addition to receiving treatment for skin cancer, his blood work indicated elevated levels of a particular CLL indicator.[16]

In 2011, appellant reported to his VA primary care physician that he was experiencing frequent and intensifying fatigue.[17] The doctor, noting elevated lymphocytes in appellant's blood work, ordered a LFT-lymphoma/leukemia panel.[18] Noticing elevated "lymphs" on his panel in conjunction with a history of skin cancer, the primary care physician referred appellant to a VA

---

[12] *Id.* at 918, 942-43.

[13] R. at 2267.

[14] R. at 24-26, 41, 654, 1566.

[15] *Id.*

[16] R. at 24-26.

[17] R. at 20-21, 595.

[18] R. at 595, 598.

3

hematologist.[19] His visit to the VA hematologist in 2012 is the incident around which appellant grounds his arguments for an earlier effective date for service connection for CLL, despite the rule section 5110 provides.

After reviewing his medical history and examining him, the hematologist diagnosed appellant with "monoclonal B-cell lymphocytosis."[20] He also noted that appellant's 2010 blood work showed levels "less than official criteria of 5000 for CLL," and, regarding CLL, he noted that "even with the label as such this would/will be stage ZERO and warrant only an annual cbcd [complete blood count with differential]."[21] The hematologist's notes from the visit are detailed.[22] Of particular importance for appellant's arguments on appeal, the hematologist, noting "no nodes or spleen," specifically stated that he "did not use the term leukemia" to describe appellant's condition.[23] The hematologist explained that instead of using the word "leukemia" he told appellant that, based on his examination, "maybe in 20 years he would need further investigation."[24] The hematologist concluded that "we can only label as 'monoclonal B-cell lymphocytosis'" and recommended annual check-ups.[25]

Appellant did not apply for benefits following his examination by the hematologist, not for leukemia, and not for the monoclonal B-cell lymphocytosis with which he had been diagnosed.[26] According to his Board hearing testimony, appellant continued receiving annual check-ups and experienced intensifying fatigue and weakness.[27] In the ensuing years, appellant would lose his

---

[19] R. at 570.

[20] R. at 27, 565; *see also* R. at 22-42.

[21] R. at 27, 565.

[22] R. at 27, 565. Here is the full text of hematologist, Dr. James K. Weick's notes from the July 23, 2012, examination of appellant reproduced as it reads on the medical examination record:

> [r]eviewed before interview; ALC >5000 since 2010 in 68 yr man. Flow done by Dr Barker in 2010= 65% clonal less than official criteria of 5000 for CLL, and even with the label as such this would/will be stage ZERO and warrant only an annual cbcd. Upon examining, there are no nodes or spleen and I did not use the term leukemia; told him that maybe in 20 yrs he would need further investigation . . . not now and we can only label as 'monoclonal B-cell lymphocytosis' and check annual cbcd." (Emphasis and punctuation original).
>
> *Id*.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *See* Appellant's Br. at 4.

[27] R. at 398-400.

4

job, unable to perform because he was weak and tired.[28] Appellant and his wife eventually sold their house in Florida in 2015 and moved to Tennessee as a consequence of appellant's unemployment.[29]

Once in Tennessee, appellant established care at a VAMC in Murfreesboro, Tennessee. Upon reviewing his medical records, his new VA physician observed the abnormalities in his past blood work and ordered new labs.[30] In January 2016, a VA oncologist diagnosed appellant with CLL, presumptively resulting from Agent Orange exposure.[31] Four days later, appellant filed a claim for benefits with VA seeking service connection for CLL.[32] Based on a review of appellant's VA medical records, the diagnosing oncologist in Tennessee determined appellant had met certain diagnostic criteria for CLL since 2010.[33] VA granted appellant service connection for CLL in an August 2016 rating decision.[34] Consistent with the effective date limits of section 5110(a), an April 2017 rating decision assigned appellant a 100% disability rating effective January 29, 2016 for CLL, the date VA received appellant's claim.[35]

In May 2017, appellant requested an earlier effective date for CLL.[36] A July 2017 rating decision affirmed his January 29, 2016, effective date, the date VA received his original claim.[37] In October 2017, appellant filed a Notice of Disagreement (NOD), and an August 2018 rating decision again denied an earlier effective date.[38] Appellant submitted another NOD in October

---

[28] R. at 399-400.

[29] R. at 400.

[30] R. at 20-21; Appellant's Br. 3-5.

[31] R. at 20-36, 2376.

[32] R. at 2379-82.

[33] R. at 23.

[34] R. at 1903-05.

[35] R. at 1747-48.

[36] R. at 1726-28.

[37] R. at 1308-09.

[38] R. at 1076-79. A procedural oddity occurred here, and we will straighten it out briefly. Following the submission of his October 2017 NOD challenging the July 2017 rating decision, appellant submitted a statement in support in July 2018 alleging clear and unmistakable error (CUE) in the determination of his effective date. The August 2018 rating decision responded only to the allegation of CUE and not the original decision review request in the October 2017 NOD. Accordingly, from July 2018 until the first Board decision in 2021, the claim stream addresses only a CUE claim, until the Board corrected the error in 2021. The Board found that addressing appellant's allegation of CUE in August 2018 was improper because appellant did not then have a final decision on his claim. The Board concluded that the issue of CUE concerning the determination of the effective date was moot because the issue still existed for

5

2018 and VA generated a Statement of the Case, maintaining the January 29, 2016, effective date.[39] In February 2020, appellant appealed to the Board and submitted a letter on his behalf by a VA physician stating the physician's view that appellant has had CLL since 2010.[40] Appellant also submitted argument to the Board pertaining to the decision the Board was set to review, arguing for an earlier effective date.[41] In November 2020, appellant appeared at a hearing before a Board member virtually and laid out his case through a representative.[42]

In February 2021, the Board issued its first decision in this case denying entitlement to an earlier effective date.[43] Appellant subsequently appealed to the Court.[44] In April 2022, the Court remanded the matter to the Board because it had not considered entitlement to an earlier effective date up to 1 year before the filing date of the claim under 38 C.F.R. § 3.114.[45]

In December 2022, the Board issued the decision on appeal.[46] Employing § 3.114(a)(3), the Board assigned appellant an earlier effective date of January 29, 2015, 1 year before VA received the initial claim.[47] The Board favorably found that appellant met the diagnostic threshold

---

the Board to review in the claim stream, as it should have proceeded in August 2018. This history does not affect our decision. We provide it for the sake of completeness.

[39] R. at 428-460, 565-570, 1067-68.

[40] R. at 403.

[41] R. at 404.

[42] R. at 396-402.

[43] R. at 389-93. This decision dismissed the errant CUE motion as moot.

[44] R. at 113. While his appeal was pending before the Court, appellant also filed a medical malpractice claim under 38 U.S.C. § 1151, per the February 2021 Board's suggestion, alleging essentially the same set of facts at issue in this appeal.

[45] R. at 113-18. 38 C.F.R. § 3.114 allows retroactive effective dates, to a certain extent, in cases where an award or increase of compensation is granted pursuant to a liberalizing law, provided that the veteran met all the criteria of the liberalizing law at that time. Section 3.114 (a)(3) in particular allows that "[i]f a claim is reviewed at the request of the claimant more than 1 year after the effective date of the law or VA issue, benefits may be authorized for a period of 1 year prior to the date of receipt of such request." *See* R. at 8-12.

[46] R. at 5-12.

[47] R. at 5, 8-12. The Board's assignment of an earlier effective date is an unreviewable favorable determination. *Roberson v. Principi*, 17 Vet.App. 135 (2003). On this point, the Secretary informed the Court of his view that the Board erred with respect to the assignment of an earlier effective date under § 3.114 (a). Secretary's Br. at 9, n. 3. The Secretary notes that the Board inaccurately states that appellant had been diagnosed with CLL "at the time of the liberalization of the law, as reflected in the July 7, 2010, blood work." *Id*. The change in the law occurred in 2003, well before appellant's diagnosis. *Id*. (*citing* 38 C.F.R. § 3.309(e)); R. at 12, 22-23. The Secretary offers these observations "to supply clarity regarding his argument," as he accurately notes that the "the Board's assignment of January 29, 2015, as the effective date for the award of service connection for CLL is a favorable finding, and, as such, may not be disturbed by the Court." Secretary's Br. at 9, n. 3; *see Roberson*, 17 Vet.App. at 139.

for CLL as early as July 2010.[48] But because he did not file a claim (or even allege he filed a claim) before January 2016, the Board concluded there was no legal route to an effective date before January 29, 2015, under law.[49] The Board acknowledged appellant's argument that it was VA's "failure to properly inform him of his CLL diagnosis" that prevented him from filing a claim earlier as appellant now argues to the Court, but noted that the "applicable regulations do not contain an exception to the effective date rules based on misdiagnosis even if that misdiagnosis is due to VA's error."[50] The Board reiterated that the law provided no route to an earlier effective date and noted that claims of medical malpractice, meritorious or not, by VA are distinct from the effective date issue and beyond the scope of the appeal before it.[51] This appeal ensued.

## B. *Taylor v. McDonough*

We've just set out the factual and procedural background concerning appellant's claim on appeal. However, there is an additional background task we must perform before we turn to resolving the merits of the appeal before us. As mentioned above, the Federal Circuit's en banc decision in *Taylor* plays a major role in our resolution of this appeal. So we take time now to unpack *Taylor*, a decision that we explain is comprised of a majority view, plurality reasoning, concurrences, and dissents. Care is needed to determine what in *Taylor* binds us today and what is merely persuasive.

---

[48] R. 11-12.

[49] R. at 9, 12.

[50] R. at 9. As mentioned throughout the remainder of the opinion, we will refer to appellant's allegation as a misdiagnosis/withholding information. We note that the Board below and appellant in his briefing refer to what appellant alleges prevented him from filing a claim by different terms at different points. In the Board decision on appeal, it twice refers to appellant's allegation as a "misdiagnosis" and once as a "failure to properly inform." R. at 9. Appellant's argument to the Court refers to the issue as "deliberate withholding of information" and other similar formulations, such as "withholding of diagnosis." Our analysis is the same under either formulation. Whether the hematologist diagnosed appellant with one condition when he should have diagnosed another, or whether he knew appellant should be diagnosed with CLL and chose not to convey that diagnosis to him, for whatever reason, our analysis of his legal claim is the same, and the result is unchanged. The Board saw the issue similarly, noting that any claim sounding in "medical malpractice by VA is distinct from the claim of entitlement to an earlier effective date herein and not within the scope of this appeal." R. at 9-10. Because these formulations present a distinction without a difference in terms of our equitable estoppel and constitutional right-of-access analyses, we will refer to appellant's allegation by both formulations, as misdiagnosis/withholding information.

[51] R. at 9-10. The Board also noted that "the Veteran's claim of medical malpractice by VA is distinct from the claim of entitlement to an earlier effective date herein" and beyond the scope of its decision. The Board also noted that appellant had filed a medical malpractice claim under section 1151, following the Board's instructions to do so in its February 2021 decision.

Like the appeal we face today, *Taylor* is also centered on section 5110's effective date limits.[52] Appellant in *Taylor* was a veteran who voluntarily participated as a test subject in a then-secret Army program at the Edgewood Arsenal facility in Maryland (Edgewood program), which studied the effects of chemical warfare agents on the human body.[53] Participants in the Edgewood program, including Mr. Taylor, were sworn to secrecy by taking an oath that forbid them from revealing any information about the Edgewood program to those not authorized to receive such information.[54] The oath did not specify who was or was not authorized to receive such information, but regardless of that omission, it was backed by the threat of a court-martial and criminal penalties for violating the secrecy prohibition.[55]

Mr. Taylor abided by the terms of the oath for over 3 decades following his discharge.[56] During that time, injuries he suffered in the program resulted in disabilities.[57] Abiding by the terms of his oath, Mr. Taylor refrained from filing a claim with VA for disability compensation.[58] As the Federal Circuit described it, the oath prevented Mr. Taylor from "pursuing the sole adjudicatory route to vindicate his statutory entitlement to disability compensation for those service-connected disabilities."[59] Mr. Taylor did not file a claim for VA benefits until 2007, after the government released him and similarly situated participants from their oaths in 2006.[60]

VA granted Mr. Taylor's claim for disability benefits and assigned an effective date of February 28, 2007, under section 5110, the date VA received his initial claim.[61] Under section 5110, the statute also at issue in the present appeal, this was the earliest effective date available to the veteran under law.[62] Appealing to the Federal Circuit from an adverse decision in our Court, Mr. Taylor claimed he was entitled to an effective date as far back as the day after his discharge

---

[52] *See Taylor*, 71 F.4th at 916-18.

[53] *Id.* at 916-17.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 916.

[60] *Id.* at 916-17.

[61] *Id.* at 920.

[62] *Id.*; *see* 38 U.S.C. § 5110.

8

in 1971, arguing that the government's oath backed by threat of criminal penalties prevented him from filing a claim to vindicate his legal entitlement to benefits.[63]

Mr. Taylor presented two theories of entitlement to an earlier effective date, the same two theories Mr. Ley advances in the present case.[64] He argued first that the doctrine of equitable estoppel applied to prevent the government from enforcing the limits of section 5110, and second, in the alternative, he maintained that enforcing section 5110 to limit his effective date would constitute a violation of his constitutional right of access to an exclusive adjudicatory forum.[65] Again, these are the precise arguments appellant offers here although under a different set of facts.[66]

The Federal Circuit agreed with Mr. Taylor but did not do so in a single opinion. Rather, the Federal Circuit's en banc opinion was divided, with three separate writings and different combinations of judges joining some sections of the opinions and not others.[67] To understand how *Taylor* does and does not bind the Court in this case we will explain the alignment of the judges in *Taylor* with respect to each legal issue. To make this assessment, it is critical to understand that there were 13 judges sitting on the en banc Federal Circuit panel.[68] So, to be binding precedent, a given part of any opinion in *Taylor* needs to have been joined by at least seven Federal Circuit judges.

Beginning with the issue of equitable estoppel, Judge Taranto wrote a majority opinion in which eight judges held that equitable estoppel was not available to circumvent the effective date rules under section 5110.[69] The majority explained that section 5110 contains no provision that imports the doctrine of equitable estoppel into a statutory standard. Therefore, the Supreme Court's rule that equitable estoppel is not available against the federal government to award funds

---

[63] *Taylor*, 71 F.4th at 917-18

[64] *Id*. at 917.

[65] *Id*. at 917-18.

[66] Appellant's Br. at 7.

[67] *Taylor*, 71 F.4th at 915.

[68] *Id*.

[69] *Id.* at 916-32. Chief Judge Moore and Circuit Judges Prost, Chen, Stoll, and Cunningham joined Judge Taranto's opinion in full. Circuit Judges Lourie and Hughes joined Parts I–IV. Parts I-IV accordingly constitute an opinion for the court.

9

appropriated by Congress established in *Office of Personnel Management v. Richmond* applied.[70] In the words of Judge Taranto's majority, "equitable estoppel is not available to override the claim-filing effective-date limits of [section] 5110."[71]

The remaining five judges joined Judge Dyk's concurring opinion that reached a different conclusion about equitable estoppel.[72] Judge Dyk concurred only in the judgment in favor of Mr. Taylor, holding that the government was equitably estopped from limiting Mr. Taylor's recovery under the rules set out in section 5110.[73] So to be clear, we have a binding rule under *Taylor* that section 5110 is not subject to equitable estoppel because eight judges on the 13-member en banc court adopted that rule.

The issue of an as-applied constitutional challenge to the application of section 5110 based on the right of access to an adjudicatory system is not so clear. Indeed, that issue deeply divided the Federal Circuit. Only six judges joined in the part of Judge Taranto's opinion (now a plurality) holding that section 5110 is subject to as-applied constitutional challenges and finding Mr. Taylor's situation constituted a rare instance in which there was a constitutional violation due to the application of section 5110's rules concerning the assignments of effective dates.[74] We will explore the plurality's decision about the constitutional issue in more detail below. For now, suffice it to say that the constitutional holding of the plurality does not constitute precedent that is binding on the Court. Judge Dyk's opinion concurring in the judgment, joined by a total of five judges including Judge Dyk, did not reach the constitutional question on constitutional avoidance grounds, choosing to resolve the case in appellant's favor on the basis of equitable estoppel.[75]

Finally, and to round out the discussion, two of the eight judges who signed onto the part of Judge Taranto's opinion concerning equitable estoppel, dissented on the constitutional question.[76] That dissenting opinion, authored by Judge Hughes and joined by Judge Lourie, would

---

[70] 496 U.S. 414 (1990). The Federal Circuit discussed the case extensively. *See Taylor*, 71 F.4th at 916-32.

[71] *Taylor*, 71 F.4th at 927-28; *see Richmond,* 496 U.S. at 427-28.

[72] *Taylor*, 71 F.4th at 946-55. Judge Dyk's opinion concurring in the judgement which Circuit Judges Newman, Reyna, and Wallach joined in full. Judge Stark joined with respect to Parts I, II, and V.

[73] *Id*. at 946.

[74] *Id*. at 917-18, 935-36.

[75] *Id*. at 946.

[76] *Id*. at 955-64.

have held for the government on the question of the right-of-access constitutional violation.[77] While the dissenters sided with Judge Taranto on the estoppel issue, they found the importance of the executive branch's national security interests provided a valid justification for infringing upon Mr. Taylor's right of access.[78] Considering the case through this national security lens, the dissent went a step further, explaining that it would have found that courts lack both the equitable and statutory authority to override or second-guess executive branch determinations regarding national security and foreign affairs.[79] So the dissent appeared to accept, at least for argument's sake, that there could be a constitutional challenge under section 5110, but limited the discussion to the national security interests implicated in Mr. Taylor's situation.

Having set out the Federal Circuit's various positions in *Taylor*, we are now able to consider the arguments at issue in the appeal. We do that next.

## II. ANALYSIS

To repeat, Congress has provided in section 5110 that the effective date of an award based on an initial claim is assigned based on "the facts found," but unless subject to an enumerated exception, "shall not be earlier than the date of receipt" of an application for compensation.[80] On appeal, appellant raises two distinct legal theories of entitlement to an earlier effective date, despite section 5110(a)'s default rule. Both theories of entitlement raise legal issues we review de novo.[81]

First, appellant argues that under the doctrine of equitable estoppel the government may not enforce the effective date rules from section 5110 where its misdiagnosis/withholding information prevented appellant from filing a claim earlier and receiving an earlier effective date.[82] Second, appellant maintains that section 5110 is unconstitutional as applied to his circumstance, because VA's misdiagnosis/withholding information effectively prevented appellant from filing a

---

[77] *Id*. at 955-56.

[78] *Id*.

[79] *Id*. at 964.

[80] 38 U.S.C. § 5110(a)(1).

[81] *Martinez v. Wilkie*, 31 Vet.App. 170, 175 (2019) (citing 38 U.S.C. § 7261(a)(1)); *see Lane v. Principi*, 339 F.3d 1331, 1339 (Fed. Cir. 2003).

[82] Appellant's Br. at 12-23.

11

claim, thereby denying his constitutional right of access to an exclusive adjudicatory forum.[83] We address each argument in turn, starting with equitable estoppel.

## A.  Equitable Estoppel

Equitable estoppel is a doctrine "invoked to avoid injustice" based on "the maxim that no man may take advantage of his own wrong."[84] Equitable estoppel is not available against the federal government to the same extent it is against private litigants.[85] The extent to which the federal government may be equitably estopped is an uncertain one under the law. But that uncertainty does not affect us today. To begin with, the Supreme Court laid out a bright line rule in *Richmond* concerning equitable estoppel against the government in cases involving claims for payment of money pursuant to congressional statutory appropriation.[86] *Richmond* holds that "judicial use of the equitable doctrine of estoppel cannot grant . . . a money remedy that Congress has not authorized."[87] The Supreme Court based its decision on the Constitution's Appropriations Clause providing that "No [m]oney shall be drawn from the [t]reasury, but in [c]onsequence of [a]ppropriations made by [l]aw."[88] The practical import of this rule is that it applies in all situations where, as here, "there is no specific statutory provision turning the [equitable estoppel] doctrine's principles into statutory standards" such that *Richmond* would be displaced by the will of Congress.[89]

*Richmond* provided the analytical foundation for the Federal Circuit's majority holding in *Taylor* that equitable estoppel was not available to overcome the effective date assignment rules under section 5110.[90] The en banc Federal Circuit majority in *Taylor* left no doubt about its holding. The majority stated that nothing in section 5110 or the related statutory scheme indicated that "Congress [] turned equitable estoppel standards into statutory standards that could alter the

---

[83] *Id*. at 7-12.

[84] *Taylor*, 71 F.4th at 925 (*quoting Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984)); *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232 (1959).

[85] *Lee v. Munroe & Thornton,* 11 U.S. 366 (1813); s*ee Richmond,* 496 U.S. at 421-22.

[86] *Richmond,* 496 U.S. at 421-22.

[87] *Id.* at 425-26 (*citing Knote v. United States,* 95 U.S. 149, 154 (1877)); *see* U.S. CONST., art. 1, § 9, cl. 7.

[88] U.S. CONST., art. 1, § 9, cl. 7; *Richmond*, 496 U.S. at 421-26.

[89] *Taylor,* 71 F.4th at 925. This rule operates under the premise that if Congress intended to build in something resembling an equitable estoppel mechanism into an appropriations statute, it knows how to do so.

[90] *Taylor*, 71 F.4th at 925-28.

12

results required by . . . [section] 5110."[91] The *Taylor* majority then stated with crystal clarity that "under *Richmond*, equitable estoppel is not available to override the claim-filing effective-date limits of [section] 5110."[92] Even if we were to disagree with it, we are bound by this holding here.

In sum, while equitable estoppel against the federal government remains something of an open question generally, the issue has been settled with respect to questions concerning payment of money pursuant to an appropriation by Congress.[93] Appellant argues just as Mr. Taylor did, that the government should be equitably estopped from enforcing the effective date limits of section 5110.[94] That argument is foreclosed by *Taylor*'s unequivocal holding that section 5110 is not subject to equitable estoppel. And that is all we need to say.[95]

### B.  Constitutional Right of Access: As-Applied Challenge

Appellant's second theory of entitlement to an earlier effective date is premised on section 5110 being subject to an as-applied challenge under the Constitution.[96] Appellant argues that section 5110 is unconstitutional as applied to his circumstance because a VA hematologist's undue active interference prevented him from filing a benefits claim, thereby denying his constitutional right of access to the exclusive forum for adjudicating entitlement to VA benefits.[97] As we described earlier, appellant claims that the VA hematologist's misdiagnosis/withholding information concerning CLL effectively prevented him from applying for benefits, leaving him shut out of the system.[98]

In this section, we first consider whether section 5110 is subject to an as-applied constitutional challenge at all. Consistent with the Federal Circuit's plurality opinion in *Taylor*, we see no reason why section 5110 would be categorically immune to an as-applied constitutional

---

[91] *Id*. at 926-27.

[92] *Id*. at 926-28; *see Richmond*, 496 U.S. at 421-23.

[93] *Heckler*, 467 U.S. at 60-61; *Taylor*, 71 F.4th at 926-28; *see Richmond*, 496 U.S. at 421-25.

[94] Appellant's Br. at 12-23.

[95] *Id*.; *Taylor*, 71 F.4th at 926-28. Appellant appears to argue that somehow *Richmond* does not apply because the government failed to fulfill a statutory prerequisite required in order to enforce section 5110 as a limitation on benefits. *See* Appellant's Br. at 12-13. This argument, which seems to focus on 38 U.S.C. § 6303, doesn't help appellant because the Federal Circuit rejected a nearly identical contention. *See Taylor*, 71 F.4th at 928-32. We won't address the matter further.

[96] Appellant's Br. at 7-12.

[97] *Id.*

[98] *Id.*

challenge. In terms of establishing that an as-applied constitutional violation has occurred, we essentially adopt the Federal Circuit plurality's reasoning about how one shows a violation of the right of access to an exclusive adjudicatory forum.[99] We then turn to appellant's claim in this appeal.

As we explain below, we conclude that VA's actions to which appellant points—the hematologist's misdiagnosis/withholding information—do not rise to the level of a constitutional violation, underscoring the rarity of finding a set of facts that establish such a violation.

### 1. Section 5110 and As-Applied Constitutional Challenges

The first step in our analysis is to decide whether section 5110 can ever be subject to an as-applied constitutional challenge. As we explained earlier, there was no majority opinion in *Taylor* about the constitutional question. However, and as we explore in a moment, Judge Taranto's plurality opinion extensively discusses how one can establish a constitutional violation in the context of the application of section 5110's effective date rules. Implicit in that discussion, of course, is the recognition that section 5110 is in fact subject to a constitutional challenge.

We agree with the premise underlying the *Taylor* plurality that nothing categorically bars section 5110 from being subject to an as-applied constitutional challenge. The Constitution sets certain boundaries, and courts enforce those boundaries.[100] Nullifying the laws of the Nation's elected representatives however, even in small part at the margins, should be done with great care given Congress' position as a coequal branch of government, and protector and interpreter of the Constitution in its own right.[101] It is for this reason that we agree with the Federal Circuit plurality that a successful as-applied challenge to the application of section 5110's effective date rules will only be based on a "very rare set of circumstances."[102]

We now consider the appropriate test a court should employ to determine whether such a "very rare set of circumstances" exists. If one has read *Taylor* what follows should appear familiar. That is so because, while not technically binding precedent, the *Taylor* plurality's analysis is persuasive. We essentially adopt it as our own.

---

[99] *Taylor*, 71 F.4th at 932-39.

[100] *See Marbury v. Madison*, 5 U.S. 137, 178 (1803).

[101] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012); *U.S. v. Harris*, 106 U.S. 629, 635 (1883).

[102] *Taylor*, 71 F.4th at 918.

We start with the constitutional right that is at issue—the right of access to adjudicative fora. The Supreme Court has characterized constitutional right of access to the courts as a "fundamental right."[103] Early on, the Court explained that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws."[104] And that was not a one-off comment—the right's importance has been repeatedly affirmed.[105] The Supreme Court has held the right of access to an adjudicatory system applies to executive agencies operating such systems, as well as to the courts.[106]

The Supreme Court explained the contours of establishing a violation of the right to access an exclusive adjudicatory forum in *Christopher v. Harbury*.[107] The Court there observed that denial of the right of access necessarily operates in reference to a specified underlying legal entitlement.[108] In this case, appellant has a constitutionally protected property interest in the disability benefits to which he claims he is entitled.[109] Accordingly, under *Christopher*, appellant has a right to access an exclusive forum for the adjudication of that property right.[110]

In terms of what the right guarantees an individual, the Supreme Court has held that the touchstone of the right of access is "meaningful access."[111] While certain cases have focused on removing specific impediments, such as filing fees or access to a law library, these decisions do

---

[103] *Tenn. v. Lane*, 541 U.S. 509, 533 (2004); *see also, e.g.*, *Ringgold-Lockhart v. Cnty. of L.A.*, 761 F.3d 1057, 1061 (9th Cir. 2014).

[104] *Marbury*, 5 U.S. at163; *see Chambers v. Balt. & Ohio R.R. Co.*, 207 U.S. 142, 148 (1907).

[105] *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996) ("The right that [we] acknowledged was the (already well-established) right of access to the courts." (emphasis omitted)); *Bounds v. Smith*, 430 U.S. 817, 824 (1977) ("[O]ur decisions have consistently required [s]tates to shoulder affirmative obligations to assure all prisoners meaningful access to the courts.").

[106] *Taylor,* 71 F.4th at 933; *see Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (explaining that the First Amendment's "Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes"); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) (applying the right of access to an executive agency).

[107] 536 U.S. 403, 405-06, 412-15 (2002).

[108] *Id.* at 412-415; *see Taylor*, 71 F.4th at 933-34.

[109] *Cushman v. Shinseki*, 576 F.3d 1290, 1297-98 (Fed. Cir. 2009).

[110] Note that an individual does not have a right to their choice of forum, if there are multiple available to adjudicate the underlying interest. The government cannot keep an individual from a forum when it is the exclusive forum for the vindication of a right, as the veterans benefits system is for the legal entitlement to disability benefits.

[111] *Lewis*, 518 U.S. at 350 ; *Bounds*, 430 U.S. at 824.

15

not "foreclose alternative means to achieve that goal," referencing "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."[112]

As the Federal Circuit plurality in *Taylor* recognized, the opportunity to litigate an underlying legal entitlement can be viewed from one of two vantage points.[113] It can be forward looking in the sense that access to an otherwise available forum is being frustrated with respect to a claim yet to be asserted.[114] Or, as here, it can be backward looking.[115] A backward-looking violation is premised on an allegation that access to the relevant forum was frustrated in the past and is no longer meaningfully available.[116] From both perspectives, the right of access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."[117] And for an alleged backward looking access violation like the one in this case, in addition to a specific legal entitlement, a remedy must be identified, one "that may be awarded as recompense but [is] not otherwise available in some suit that may yet be brought."[118]

Given the existence of an underlying legal entitlement and an exclusive remedy, the Federal Circuit plurality in *Taylor* formulated a test for adjudicating a right-of-access claim. That approach, adopted from the Ninth Circuit Court of Appeals' formulation in *Silva v. Di Vittorio*, describes the right-of-access violation as "active interference" on the part of the government, that is "undue."[119] While the Supreme Court has not explicitly established a test for assessing a right of access violation, the Federal, Seventh, and Ninth Circuits have determined that the undue, active interference test is consistent with the Supreme Court's formulation of the right-of-access violation in *Christopher*.[120]

The Federal Circuit's plurality in *Taylor* provides useful markers for employing the "active interference" prong of the analysis. A court asks "whether the government has, by affirmative

---

[112] *Bounds*, 430 U.S. at 830, 825; *Lewis*, 518 U.S. at 351.

[113] *Taylor*, 71 F.4th at 932-34; *Christopher*, 536 U.S. at 412-15.

[114] *Taylor*, 71 F.4th at 933; *Christopher* at 412-15.

[115] *Taylor*, 71 F.4th at 933.

[116] *Id*.; *Christopher*, 536 U.S. at 415-16.

[117] *Christopher*, 536 U.S. at 414-15.; *Lewis*, 518 U.S. at 352.

[118] *Taylor*, 71 F.4th at 932-35; *Christopher*, 536 U.S. at 414-15.

[119] *Taylor*, 71 F.4th at 935; *Silva v. Di Vittorio*, 658 F.3d 1090, 1103 (9th Cir. 2011).

[120] *Taylor*, 71 F.4th at 935; *see Snyder v. Nolen*, 380 F.3d 279 (7th Cir. 2004) (per curiam) (applying a similar test); *see also Silva*, 658 F.3d at 1103.

16

conduct, unduly interfered with the individual's access to the adjudication offered by the forum."[121] In *Taylor*, the plurality found that the government's "securing [of] a secrecy oath backed by court-martial and prosecution threats" constituted affirmative conduct, meeting the standard of active interference.[122] While noting that there is not a general test for specifying what level of interference suffices, the court found that the terms of the Edgewood program's secrecy oath would be naturally understood as "foreclosing the ability to support an essential element of the standard for benefits" and it "actually caused Mr. Taylor to refrain from filing the claim at issue to vindicate his legal entitlement" until the oath was lifted three and a half decades later.[123] While not describing a universal standard, the *Taylor* plurality described the Edgewood program oath as "ample affirmative interference with the right of access at issue."[124] This discussion guides our application of the constitutional test.

Judge Taranto's plurality opinion in *Taylor* does not squarely address the undue prong of the test, but the plurality considered the government's argument that, assuming it had actively interfered with Mr. Taylor's access to the VA benefits forum, such interference was justified on national security grounds.[125] While the *Taylor* plurality again noted that the Supreme Court had not established a standard in the right-of-access context for evaluating a stated justification for an interference, it did not question the strength of the professed national security interest.[126] Instead, the plurality relied on the fundamental nature of the right of access to courts in our system of government and borrowed from the Supreme Court's caselaw addressing when "military-secrecy interests preclude the maintenance or continuation of litigation" to decide that strict scrutiny applied to the government's asserted justification.[127]

---

[121] *Taylor,* 71 F.4th at 935.

[122] *Id*.

[123] *Id*.

[124] *Id*. at 935-36.

[125] *Id*. at 939-41. Again, while the opinion couches this discussion in terms of the *Silva* test's undue prong, the government's argument and the court's response in *Taylor* function to the effect that a *justified interference* would not be *undue*.

[126] *Id*.

[127] *Id.* at 939-40; *see General Dynamics Corp. v. U.S.*, 563 U.S. 478, 486, 492 (2011) (*citing Totten v. U.S.,* 92 U.S. 105, 107 (1876)); *Reno v. Flores,* 507 U.S. 292, 301-02 (1993) (explaining that due process "forbids the government to infringe certain 'fundamental' liberty interests *at all* . . . unless the infringement is narrowly tailored to serve a compelling state interest."); *see also Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir. 1983) (applying strict scrutiny to a constitutional right-of-access claim).

17

Under a strict scrutiny analysis, the *Taylor* plurality determined that the Edgewood program's secrecy oath was not sufficiently narrowly tailored to achieve the government's compelling interest in national security.[128] According to the court, the government presented only "generalizations about military secrecy," offering no "concrete reasons that this interest could not have been protected while giving Edgewood veterans [access to] an adjudication."[129] On its face, the government's required secrecy oath contained no exceptions, nor did it so much as define who was or was not "authorized to receive [the] information" protected under the oath.[130] Beyond that, the court pointed to procedural mechanisms within VA for dealing with secrets, special operations, and classified records, none of which were available for Edgewood program participants, despite the foreseeable health consequences for these veterans.[131]

As a final step, the Federal Circuit determined that section 5110 was unconstitutional as applied to Mr. Taylor.[132] And as to remedy, the court held that veterans in Mr. Taylor's position are entitled "under ordinary remedial principles, to receive benefits for service-connected disabilities from the effective date that the veteran would have had in the absence of the government's challenged conduct."[133] But the court also underscored that it was a remarkably rare situation that would support ruling in a claimant's favor on an as-applied challenge to the application of section 5110's effective date rules.[134] Indeed, the court signaled that its decision was essentially limited to the specific facts of Mr. Taylor's case and did not expand the scope of right-of-access violations.[135]

To summarize: Showing a backward-looking constitutional right-of-access violation requires appellant to show that his opportunity to litigate an underlying legal entitlement is no longer available due to active interference on the part of the government that is undue. Appellant must also identify a remedy that is within the Court's power and not available elsewhere or by

---

[128] *Taylor,* 71 F.4th at 940-42.

[129] *Id*. at 940.

[130] *Id*. at 915-16, 939-42.

[131] *Id*. at 941-42.

[132] *Id*. at 917-18, 932-44.

[133] *Id*. at 918.

[134] *Id*. at 918, 932-942, 945-46.

[135] *Id*. at 945-46.

18

other means. Where unconstitutional interference is found, an asserted justification by the government must pass strict scrutiny.

### 2. Appellant's Situation is Not One of the "Very Rare Set of Circumstances" in Which Section 5110 is Unconstitutional As Applied.

Applying the test we have set forth for assessing a claim that government conduct has denied access to an exclusive adjudicatory forum, we conclude that appellant's as-applied constitutional challenge to section 5110 fails. We begin with some positive findings about appellant's claim. His claim meets the initial requirements constituting a backward-looking right-of-access violation.[136] There is an underlying legal entitlement, his claim for benefits, and the opportunity to adjudicate that entitlement between 2010 and January 2016 is no longer available.[137] And unlike the plaintiff-respondent before the Supreme Court in *Christopher*, our appellant has identified a specific remedy that flows from that entitlement, namely an effective date calculated as if the alleged interference did not occur.[138] And finally, appellant seeks a remedy that the Court has the power to award, and we assume for the sake of this analysis that this remedy is no longer available by other means.[139]

But that is as far as appellant gets. Even considering the facts in the record in the light most favorable to appellant, he has not successfully established a violation of his constitutional right of access under the test we set forth above.[140] Recall, appellant's assertion is that the VA hematologist misdiagnosis/withholding information prevented him from accessing the VA benefits system, making the application of section 5110's effective date rules unconstitutional as applied to him. We'll explain now why that claim fails, as well as why that outcome makes sense.

---

[136] *Christopher,* 536 U.S. at 414-15.

[137] *Id.* It is unclear based on appellant's argument when the alleged interference began. Appellant's Br. at 2-12. While the Board found that appellant met the diagnostic criterion for CLL as early as 2010, appellant's theory of active interference is based on an interaction with a VA hematologist in 2012. R. at 5-12, 565; Appellant's Br. at 7-12. Because appellant's challenge is unsuccessful considered from any point in the relevant time period, determining the precise date appellant alleges that the interference began is immaterial.

[138] *Christopher,* 536 U.S. at 405-06, 412; Appellant's Br. at 7-12.

[139] *See* 38 U.S.C. § 7261; *Taylor*, 71 F.4th at 917-18. We assume, without deciding, that appellant has no remedy through another mechanism. That said, we note that appellant's failure to show that he was unable to pursue a tort action that would allow him to collect the amount of VA payments he believes he missed out on would generally be fatal to his appeal. *See Christopher*, 536 U.S. at 422.

[140] Appellant's Br. at 7-12; *Taylor,* 71 F.4th at 932-35.

19

Appellant's claim fails at the first step—was there active interference from the government that prevented him from accessing the VA benefits system? The answer is a resounding "no." Nothing the government did placed an affirmative barrier between appellant and VA's benefits adjudication system.[141] Appellant was referred to a VA hematologist after reporting fatigue and presenting with elevated readings in his blood work.[142] The hematologist diagnosed appellant with monoclonal b-cell lymphocytosis and recorded that diagnosis in his report.[143] At this point, given his symptoms and diagnosis, appellant was free to file an initial claim for benefits for his diagnosis and disabling symptoms, regardless of whether the hematologist's diagnosis was correct or included the term leukemia. Accordingly, appellant's circumstance lacks the affirmative interfering conduct and wholesale denial of meaningful access observed by the court in *Taylor*.

While appellant's brief asserts that only a CLL diagnosis would have signaled to him that it was time to file a claim, the diagnosis he received is listed in the same rating provision alongside CLL.[144] Appellant's argument assumes that his ability to access the benefits system depended on obtaining a particular diagnosis for a well-known and serious condition that comes with an automatic 100% disability rating, but this is not so.[145] Critically, this was never an all-or-nothing scenario. At the time appellant left the hematologist's office in July 2012, there were no affirmative barriers between appellant and the VA benefits system, and certainly none resulting from what the hematologist did that day. This is even more apparent in light of the fact that appellant was reporting disabling symptoms, a sign that he knew he was not well.[146] Whether the hematologist diagnosed CLL or monoclonal B-cell lymphocytosis, appellant's position relative to the benefits system was unchanged. There simply is no evidence of affirmative interfering conduct on the part of the government here.[147] Nothing about receiving one diagnosis versus another offends the

---

[141] *See* R. at 27, 565.

[142] R. at 565, 595, 598.

[143] R. at 565.

[144] *See* 38 C.F.R. § 4.117 (2024).

[145] *Id.*; Appellant's Br. at 7-12.

[146] R. at 22-42, 565, 595, 598.

[147] In conducting this right-of-access constitutional analysis, we are making no determinations regarding the appropriateness of appellant's diagnosis or medical care generally. If appellant believes he experienced medical malpractice or similar conduct, he may pursue that claim. Indeed, the record shows he is doing just that through his section 1151 claim. R. at 22-42; Secretary's Br. at 18-19. Additionally, conducting this analysis does not require the Court to make factual determinations concerning appellant's medical care. *See, e.g.*, *Tadlock v. McDonough*, 5 F.4th

Constitution by preventing a veteran from *filing a claim*. Without any affirmative, active interference frustrating his access, appellant's circumstance is far afield of the "very rare set of circumstances" that could support us finding a constitutional violation.

This case stands in marked contrast to *Taylor,* a comparison that drives home the conclusion that Mr. Ley's situation is nothing like the "very rare set of circumstances" that provided Mr. Taylor relief under the Constitution. In *Taylor*, the government's interference was affirmative and definitive.[148] While our appellant had a ratable diagnosis from a VA physician in hand and no government-imposed barriers to file, Mr. Taylor faced the affirmative threat of prosecution for attempting to support his claim for benefits.[149] The threat of prosecution was imposed by the government and without exception.[150] The plurality found that though the Edgewood oath did not bar the filing of claim by its terms, the standing threat of prosecution was a sufficient deterrent, such that no reasonable person would believe they were at liberty to file a claim. Second, had Mr. Taylor decided to risk prosecution and filed, his claim would have been unable to succeed substantively absent breaking his oath. The plurality accordingly found that filing a claim that cannot succeed was not meaningful access in terms of what is guaranteed by the Constitution.

None of the affirmative, government-imposed barriers that stood between Mr. Taylor and the benefits system are present in this case. While appellant has properly structured a right-of-access claim in the abstract, the substance of the claim is wholly without merit. As explained above, when appellant left the VA hematologist's examination, nothing on the part of the government interfered or proceeded to interfere with his ability to access the benefits system. And his ratable diagnosis, regardless of whether that diagnosis was correct or a complete picture of his situation, was such that he not only had access, that access was meaningful.

Finally, it makes sense that the facts appellant presents do not establish a constitutional violation. Unlike the unique—and "very rare"—circumstances present in *Taylor*, we are dealing with the bread-and-butter of the VA benefits and healthcare system. That system relies on trained medical experts making reasoned, informed judgments about medical questions. Keep in mind that

---

1327, 1314 (Fed. Cir. 2021). We evaluate only the arguments, the decision of the Board below, and the evidence of record to determine the extent to which, under law, the government actively, unduly interfered with appellant's right of access to the benefits system. *Taylor,* 71 F.4th at 933-35.

[148] *Taylor,* 71 F.4th at 915-18, 935.

[149] *Id*. at 916-18; R. at 565.

[150] *Taylor,* 71 F.4th at 915-18, 935-36.

21

in *Taylor*, meaningful access to a benefits adjudication was foreclosed because appellant, even if he had filed a claim, could not support his claim for benefits without risking criminal prosecution.[151] Looking at the examination report the hematologist provided in the present case, we see a medical expert making an informed, expert medical judgment concerning a patient's condition.[152] Perhaps the hematologist made a mistake; perhaps not. But that a second medical expert looking back years later would have reached a different reasoned conclusion, even if that second opinion was the correct one, fails to describe a constitutional right-of-access violation.[153] At the very worst, assuming the first doctor's judgment was wrong, or even unimaginably wrong, we are still far from the type of active and undue interference with access to a judicial forum that occurred in *Taylor*.[154]

Stated differently, if there is a constitutional violation here, then the narrow exception the *Taylor* plurality described—and that we independently adopt today—would swallow the general rule section 5110 provides. That simply can't be the case, and we won't convert VA's medical system into what could become a breeding ground for constitutional violations. And that is especially so because doing so would functionally usurp Congress' power to define the appropriate means by which to assign effective dates for VA benefits.

### III. CONCLUSION

After consideration of the parties' briefs, oral arguments, the record on appeal, and the governing law, the Court AFFIRMS the December 8, 2022, Board decision denying appellant entitlement to an effective date earlier than January 29, 2015, for CLL.

JAQUITH, *Judge*, dissenting: I admire, agree with, and join much of the majority opinion, including that *Taylor*[155] forecloses equitable estoppel overriding the effective date limits of 38 U.S.C. § 5110 and although *Taylor* does not establish a binding rule about as-applied constitutional challenges under section 5110, the *Taylor* plurality demonstrates that section 5110 can be

---

[151] *Taylor,* 71 F.4th at 915-18.

[152] R. at 565.

[153] R. at 20-24, 27; s*ee Taylor,* 71 F.4th at 932-39.

[154] *See* R. at 5-12, 20-24, 565.

[155] *Taylor v. McDonough*, 71 F.4th 909 (Fed. Cir. 2023) (en banc).

unconstitutional as applied. However, I disagree with the majority's conclusion that section 5110 is not unconstitutional as applied to Mr. Ley, so I respectfully dissent. In my view, a VA doctor's decision to deceive a patient about the nature and extent of his disability is (and should be) the kind of extraordinarily rare circumstance that justifies ordering the assignment of an effective date outside the parameters of section 5110.

The majority does not really make a contrary determination. Footnote 50 sets forth the majority's analysis of the issue—and that's where our roads diverge, and I take the road less traveled, at least today.[156] The majority embraces the Board's characterization of the veteran's allegation of the doctor's conduct as a "misdiagnosis" and acknowledges that the veteran also argued that the doctor deliberately withheld information and failed to properly inform him; but the majority asserts that its analysis and conclusion are the same under each formulation.[157] In my view, if the hematologist "knew appellant should be diagnosed with CLL and chose not to convey that diagnosis to him,"[158] that hematologist—a VA doctor—foreclosed VA's use of section 5110 as a sword to cut off, from the effective date for his claim, the years until the veteran was told the truth (by a forthcoming VA doctor) about the serious nature of his disability.

The Board found that the veteran's "entitlement to service connection [for CLL] arose on July 7, 2010," the date that evidence of the veteran's CLL appeared in a pathology report.[159] But the Board denied an effective date earlier than January 29, 2015—1 year before the veteran filed his CLL claim—based on section 5110 and 38 C.F.R. § 3.114.[160] The Board "acknowledge[d] the [v]eteran's assertion that VA's failure to properly inform him of his CLL diagnosis prevented him from filing an earlier disability compensation claim"[161] and did not question the credibility of that assertion,[162] instead finding "that the applicable regulations do not contain an exception to the

---

[156] *See* Robert Frost, *The Road Not Taken*, https://www.poetryfoundation.org/poems/44272/the-road-not-taken (last visited Dec. 27, 2024).

[157] *Ante* at 7, n. 50.

[158] *Id.*

[159] R. at 10.

[160] R. at 9.

[161] *Id.*

[162] *See Miller v. Wilkie*, 32 Vet.App. 249, 261 (2020) (noting that in such circumstances, the Court "may reasonably conclude that [the Board] implicitly found the veteran credible").

effective date rules based on misdiagnosis even if that misdiagnosis is due to VA's error."[163] And that is where the Board veered off the statutory and regulatory road, by equating "VA's failure to properly inform [the veteran] of his CLL diagnosis" with misdiagnosis.[164]

A misdiagnosis is "[a] wrong or mistaken diagnosis."[165] Here, there was a misdiagnosis— by the July 2010 pathologist who erroneously said that the diagnostic criterion for lymphocytes had not been met.[166]  The Board credited the February 2020 VA oncologist who noted that the July 2010 pathology report showed that the veteran even then had CLL, a cancer related to exposure to Agent Orange.[167] But the Board did not explain how or why it whitewashed an intentional decision by the July 2012 VA hematologist not to tell the veteran that he had CLL[168] as a misdiagnosis. And the majority opinion shrugs off that shortcoming by accepting such distinct conduct as being close enough.

In my view, the majority's suggestion that *Taylor* is limited to its facts[169] is not supported by the decision. The plurality did not say *Taylor* is so limited, only that it addressed what it "would expect to be a very rare set of circumstances."[170] As the majority here acknowledges, Mr. Ley claims a colorable right-of-access violation—he is entitled to disability benefits, his opportunity to secure an earlier effective date is no longer otherwise available, and the Court has the power to award an earlier effective date, as if the alleged interference did not occur.[171] But the majority finds that there was no active interference with the veteran's claim.[172] In my view, that conclusion is wrong and contrary to *Taylor*.

---

[163] R. at 9.

[164] *Id.*

[165] *Misdiagnosis*, STEDMAN'S MED. DICTIONARY 1215 (28th ed. 2006); *see Misdiagnose*, WEBSTER'S II NEW COLL. DICTIONARY 700 (2001) (defining misdiagnose as "[t]o diagnose incorrectly.").

[166] R. at 26.

[167] R. at 22-23, 5 ("The competent evidence of record demonstrates that the [v]eteran met the criteria for a diagnosis of chronic lymphocytic leukemia on July 7, 2010."), 10 ("Therefore, entitlement to service connection arose on July 7, 2010.")

[168] R. at 27.

[169] *Ante* at 18.

[170] *Taylor*, 71 F.4th at 918. Only the dissenters saw such a limitation. *Id.* at 964.

[171] *Ante* at 19; *see Taylor*, 71 F.4th at 917-18.

[172] *Ante* at 20.

24

First, it bears repeating that we are dealing with a "fundamental right of access to the exclusive adjudicatory forum for vindication of [the veteran's] legal entitlement to VA disability benefits"—a foundational right in our legal system.[173] I agree with my colleagues that the *Taylor* plurality's analysis is persuasive. Though plurality opinions are not binding, "they are persuasive authority."[174] When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of a majority of the judges, the holding of the Court may be viewed as that position taken by the judges who concurred in the judgments on the narrowest grounds.[175] We look for a common denominator on which a majority of judges agree.[176] In *Taylor*, the plurality opinion concludes with the common denominator: "[W]hen a veteran has been determined to be entitled to benefits for one or more disabilities connected to participation in the . . . program at issue, the required effective date of such benefits is the date that the veteran would have had in the absence of the challenged government conduct."[177] As a veteran entitled to benefits denied an earlier effective date because of a VA hematologist's intentionally deceptive conduct, Mr. Ley should receive the benefit of that *Taylor* holding.

As the majority acknowledges, *Taylor* requires affirmative conduct that unduly interfered with the individual's access to adjudication.[178] Since effective dates are substantive limitations on the amount due, the statutory standards are subject to the same as-applied constitutional challenge as effective dates for benefits.[179] Contrary to the Secretary's assertion,[180] an intent to interfere is

---

[173] *Taylor*, 71 F.4th at 932. The multiple roots for veterans' right of access include their "constitutional right to have [their] claim[s] for veteran[]s disability benefits decided according to fundamentally fair procedures." *Cushman v. Shinseki*, 576 F.3d 1290, 1302 (Fed. Cir. 2009); *see id.* at 1298 ("[E]ntitlement to [veterans] benefits is a property interest protected by the Due Process Clause of the Fifth Amendment to the United States Constitution"). Indeed, "[t]he entire thrust of []VA's nonadversarial claims system is predicated upon a structure which provides for notice and an opportunity to be heard at virtually every step in the process." *Thurber v. Brown*, 5 Vet.App. 119, 123 (1993).

[174] *Barbour v. Haley*, 471 F.3d 1222, 1229 (11th Cir. 2006).

[175] *Marks v. US.*, 430 U.S. 188, 193 (1977).

[176] *Whole Woman's Health v. Paxton*, 10 F.4th 430, 440 (5th Cir. 2021), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

[177] *Taylor*, 71 F.4th at 946. *Compare id.* at 934-35 (the plurality writing that VA's "affirmative conduct unduly interfered with [Mr. Taylor's right to] access to the adjudication" of his benefits.) *with id.* at 955 (the concurrence declaring that "equitable estoppel . . . is premised on [VA']s misconduct").

[178] *Id.* at 935.

[179] *Id.* at 926.

[180] Secretary's Br. at 18.

25

not required, only that interference was the foreseeable consequence of the conduct[181] or its "natural, predictable effect."[182] The veteran is entitled to "access to meaningful adjudicatory processes."[183] So the interference need not completely foreclose filing a claim; the opportunity to file a minimal or placeholder claim is insufficient access.[184]

The record reflects that the VA hematologist actively interfered in July 2012. The hematologist noted that the veteran had an absolute lymph count greater than 5000 since 2010[185]— the criterion the VA oncologist later found conclusive proof that Mr. Ley had CLL from that time forward.[186] But the hematologist said "this would/will be stage ZERO and warrant only an annual [complete blood count differential];" he "did not use the term leukemia" and told Mr. Ley "that maybe in 20 y[ea]rs he would need further investigation . . . not now;" and said he could only label Mr. Ley's condition as "monoclonal B-cell lymphocytosis."[187] The hematologist added, "I did no tests nor scheduled any return to [hematology]," and the accompanying nurse's note reflects that no laboratory tests were done and the veteran's condition was listed as not service connected.[188]

Stating "I did not use the term leukemia" when explaining Mr. Ley's condition to him, the VA hematologist highlighted that he affirmatively chose his words, as he did when he told Mr. Ley "that maybe in 20 y[ea]rs he would need further investigation [but] not now," and noted his corresponding intentional decision not to do any tests or schedule further treatment. And the hematologist's affirmative conduct reportedly had an effect. Afterward,

> Mr. Ley continued to experience weakness and a lack of energy[,] [b]ut because the VA oncologist deliberately "did not use the term leukemia[,]" Mr. Ley did not realize what was happening to his body. He did not apply for any VA benefits because he didn't know anything was wrong that would qualify him for benefits.[189]

---

[181] *Taylor*, 71 F.4th at 939.

[182] *Id.* at 935.

[183] *Id.*

[184] *Id.* at 938.

[185] R. at 27.

[186] R. at 23.

[187] R. at 27.

[188] *Id.*

[189] Appellant's Br. at 4.

26

In a November 2022 statement, the veteran recounted the problems he and his family faced during 6 years of his care through the West Palm Beach VA (2009-15):

> Not knowing what was happening to me physically and mentally. Feeling weak, tired, lack of energy and strength caused tensions in the family, friends and at work. Losing employment, jobs, feeling lazy having others help with my work and being fired several times in those years is really had to handle. Financially we had to sell our home in Florida that we all loved and moved to a smaller home in Tennessee in 2015. Maybe the West Palm Beach VA was over worked or lacked staff to address my problems or concerns for six years? . . . If I was correctly diagnosed in 2010, I would have filed for [m]ilitary [b]enefits that would have help my CLL from getting worse.[190]

In another November 2022 statement, the veteran said that the hematologist's July 2012 report, "stopped anyone from evaluating or assessing me again until I moved to Tennessee and was tested and evaluated in 2016. That is when l was first told I have CLL. I filed a claim."[191] And the record includes reports of blood work between August 2009 and January 2016 showing increasing lymphocyte levels above the reference normal range, but almost nothing else.[192]

Mr. Ley complained about the early misdiagnosis of his condition, but he also emphasized that VA knew, hid, and did not tell him that he had CLL for 6 years.[193] VA even admitted that the veteran was not informed of his condition and apologized.[194] Yet the December 2022 Board did no more than respond to the "[v]eteran's assertion that VA's failure to properly inform him of his CLL diagnosis prevented him from filing an earlier disability compensation claim" by noting "that the applicable regulations do not contain an exception to the effective date rules based on misdiagnosis."[195] But hiding, not telling, and preventing are not misdiagnosing.

Of course, the Board cannot adjudicate a constitutional challenge, but presentation of supporting evidence to the Board falls within its record development and factfinding functions.[196]

---

[190] R. at 42.

[191] R. at 21.

[192] *See* R. at 28-34.

[193] R. at 21.

[194] R. at 459. In 2019, VA's Decision Review Officer wrote, in a Statement of the Case: "I extend my sincere apology that you were not informed of your condition until a later date." *Id.*

[195] R. at 9.

[196] *Bowling v. McDonough*, 38 F.4th 1051, 1059 (Fed. Cir. 2022).

27

No meaningful development or factfinding happened here, only the misbegotten conflation of misdiagnosis and active interference with the veteran's access.

Perhaps the absence of meaningful development or factfinding explains why there is no information of record regarding why the VA hematologist deceived the veteran about the nature of his disability. Or the absence of any justification may be related to the statutory requirement that "all patient care furnished under [title 38] shall be carried out only with the full and informed consent of the patient."[197] The absence of any justification for not informing the veteran that he had CLL—much less a justification that would withstand strict scrutiny—is a significant counterbalance to the notion that different rules should apply to Mr. Ley because he wasn't threatened with prosecution if he filed a claim. The interference in *Taylor* was more egregious than here, but the national security justification in *Taylor* was infinitely more than the complete zero for justification here. And the veteran's evidence that the interference here was a showstopper is unrebutted. After all, a claim for disability compensation requires a service-connected disability.[198] And the presumptive service connection Mr. Ley gained was based on his CLL, [199] per § 3.309(e).[200] Moreover, the veteran submitted his claim for benefits for CLL on January 25, 2016,[201] just 4 days after a VA oncologist told him he had CLL.[202]

The majority puts great stock in the veteran's ability to file a claim for monoclonal B-cell lymphocytosis, as a ratable diagnosis.[203] However, the difference between what the veteran was told and the CLL he was suffering from was particularly stark in 2012. At that time, § 4.117 did not reference monoclonal B-cell lymphocytosis, which was not added to DC 7703 until 2018.[204] And monoclonal B-cell lymphocytosis is still not on § 3.309(e)'s list of diseases subject to presumptive service connection. In addition to *Taylor's* express rejection of the placeholder

---

[197] 38 U.S.C. § 7331; *see* 38 C.F.R. § 17.32(c) (2024) ("Informed consent is the process by which the practitioner discloses to and discusses appropriate information with a patient so that the patient may make a voluntary choice about whether to accept the proposed diagnostic or therapeutic procedure or course of treatment.").

[198] *See*, *e.g.*, 38 U.S.C. § 101(13).

[199] R. at 1308, 1886.

[200] R. at 6, 9.

[201] R. at 2379-82.

[202] R. at 2376.

[203] *Ante* at 21.

[204] 38 C.F.R. § 4.117, DC 7703 (eff. Dec. 9, 2018).

28

scenario,[205] Mr. Ley's ratable CLL was kept from him in favor of a condition neither ratable nor presumptively service connected.

If this case was about two doctors disagreeing over the appropriate diagnosis,[206] there would be no dissent. But that characterization of the facts ignores the inconvenient truth that the VA hematologist decided to withhold the truth from the veteran, and that decision resulted in the veteran's claim and benefits being delayed several years. I agree with the majority that "the VA benefits and healthcare system . . . relies on trained, medical experts making reasoned, informed judgments about medical questions,"[207] but I would add that it also relies on "communicating those judgments to the affected patients" and "describing them in patients' medical records."[208] The hematologist's unexplained decision to mislead Mr. Ley left him and VA caregivers in the dark for several years and deprived Mr. Ley of benefits to which the truth entitled him. I respectfully dissent.

---

[205] *Taylor*, 71 F.4th at 938.

[206] *See ante* at 22.

[207] *Id.*

[208] The financial impact of the deception of Mr. Ley is measurable, but there is no record information on whether that deception diminished his subsequent care, which may be incalculable.